FILED
United States Court of Appeals
Tenth Circuit

April 17, 2013

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

ERIC M. MADRID,

      Defendant-Appellant.

No. 12-2095

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:08-CR-00683-LH-1)**

Benjamin A. Gonzales, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

Laura Fashing, Assistant United States Attorney (Kenneth J. Gonzales, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff-Appellee.

Before **LUCERO**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

**SEYMOUR**, Circuit Judge.

Eric Michael Madrid appeals his conviction on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Mr. Madrid pled guilty to the charge but preserved his right to appeal the district court's denial of his motion to suppress evidence. For the following reasons, we AFFIRM.

## I.

At 7:53 p.m. on November 4, 2007, an operator with the Sandoval County Communications Section received a 911 call from an unidentified male tipster. The caller reported that he was in the parking lot of the Rinaldi Apartments in Bernalillo, New Mexico, and that there was suspicious activity occurring. He said there were two cars and two men and a woman in the parking lot. He reported that the two men were arguing and "getting into each other's faces," and that it looked like the men were about to fight. The caller told the operator that his fiancée was supposed to arrive shortly and he was afraid to leave her in the parking lot alone. He described one of the two vehicles as a white, four-door Pontiac and described the clothing of the men who were arguing. He said he did not see any weapons. As he was talking to the 911 operator, the caller saw police cars drive past the entrance to the parking lot. He told the operator that when the police cars passed by the suspects began "scattering" and the white Pontiac was leaving the parking lot.

Lt. Stoyell was dispatched to the Rinaldi apartments at 7:55 p.m. Officers Sanchez and Marshall were dispatched one minute later. A dispatch operator

conveyed to the officers by radio that a 911 call had originally reported a suspicious subject but subsequently changed the report to a fight. The dispatcher advised the officers that there were two males and a female arguing in the parking lot and relayed the description of the vehicles and clothing given by the caller. Lt. Stoyell and Officer Marshall arrived at the apartments at 7:57 p.m. Lt. Stoyell stopped the white Pontiac and Officer Marshall stopped the other vehicle. Lt. Stoyell shined his spotlight on the Pontiac and waited for backup to arrive. Officer Sanchez arrived about a minute later, parked his vehicle alongside Lt. Stoyell's, and shined his spotlight through the front windshield of the Pontiac.

Lt. Stoyell approached the driver's side of the Pontiac while Officer Sanchez approached the passenger's side to provide cover and to determine whether anyone else was in the car. Lt. Stoyell recognized the driver as Mr. Madrid, whom he knew from prior encounters. Lt. Stoyell had executed a search warrant on Mr. Madrid's home about a month earlier, and he knew that Mr. Madrid had recently been released from the penitentiary and was a convicted felon. Officer Sanchez also recognized Mr. Madrid from prior investigations and was aware he was a convicted felon.

Lt. Stoyell advised Mr. Madrid that he was investigating a possible fight and asked what had been going on in the parking lot. Mr. Madrid replied that he and his companions had not been fighting, but had just been talking. Lt. Stoyell then requested Mr. Madrid's license, registration and proof of insurance, which he

provided. At about this time, Officer Sanchez looked through the passenger side windows of the car and saw a rifle case on the back seat. He believed it was likely the case contained a rifle and he told Lt. Stoyell there was a rifle in the car. Lt. Stoyell requested that Mr. Madrid exit the car for officer safety reasons, patted down Mr. Madrid, and handcuffed him.

Meanwhile, Officer Sanchez removed the rifle case from the car, noticed it was heavy enough to contain a rifle, and saw the rifle when he opened the case. Officer Sanchez then went to assist Officer Marshall for about five to seven minutes when he was told one of the passengers in the other car had an outstanding warrant for her arrest. When Officer Sanchez returned to the Pontiac, he spoke with Lt. Stoyell, secured the rifle, and checked to see if it was stolen.

Lt. Stoyell notified Mr. Madrid that he could be charged with being a felon in possession of a firearm and asked if he would be interested in working off the charge by cooperating with the police in other investigations. Mr. Madrid agreed to cooperate, so Lt. Stoyell released him but kept the rifle for evidence. The officers did not file a report on the incident because Mr. Madrid had indicated he was interested in cooperating. When Mr. Madrid's cooperation did not materialize, the officers eventually proceeded with the felon-in-possession case against him.

Mr. Madrid was indicted by a federal grand jury on one count of being a felon in possession of a firearm, and one count of possessing a firearm after

having been convicted of a misdemeanor domestic violence offense, in violation of 18 U.S.C. §§ 922(g)(1), 922(g)(9) and 924(a)(2). Mr. Madrid filed a motion to suppress the rifle. The district court held an evidentiary hearing and denied his motion. Mr. Madrid subsequently pled guilty to the felon-in-possession count pursuant to a plea agreement in which he reserved his right to appeal the district court's denial of his motion to suppress.

Mr. Madrid filed a notice of appeal on October 19, 2009, three weeks after the ten-day period to appeal had expired. He subsequently filed a motion under Federal Rule of Appellate Procedure 4(b)(4) to extend the time in which to file his notice of appeal, claiming excusable neglect. The government moved to dismiss the appeal based on the late filing, but the district court granted Mr. Madrid's motion. The government then moved this court to dismiss Mr. Madrid's appeal, which we did, holding that his notice of appeal was untimely and that his error did not constitute excusable neglect. *United States v. Madrid*, 633 F.3d 1222, 1227-28 (10th Cir. 2011). On December 27, 2011, Mr. Madrid filed a motion to vacate, set aside or correct his sentence under 28 U.S.C. §2255. The district court granted the motion in part, finding that Mr. Madrid's trial counsel was ineffective for failing to file a timely notice of appeal. The court vacated its original judgment and reentered it so that Mr. Madrid could file a timely notice of appeal, which he did on June 6, 2012.

**II.**

Mr. Madrid contends the district court erred in denying his motion to suppress, asserting the evidence against him resulted from an investigatory stop that lacked reasonable suspicion in violation of the Fourth Amendment.  In reviewing the denial of a motion to suppress, "[w]e view the evidence in the light most favorable to the government and review the district court's factual findings for clear error.  We review the district court's ultimate determinations of reasonableness under the Fourth Amendment de novo." *United States v. Tucker*, 305 F.3d 1193, 1199 (10th Cir. 2002) (internal citations and quotation marks omitted).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.  It is well established that "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).  In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court established a two-pronged test to determine the reasonableness of investigatory detentions.  For an investigatory detention to be reasonable it must be "justified at its inception" and the officer's actions must be "reasonably related in scope to the circumstances which justified the interference in the first place."

*Id.* at 20. The only issue in this appeal is whether the seizure of Mr. Madrid was justified at its inception.

Under *Terry* and its progeny, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry*, 392 U.S. at 30). "An investigatory detention is justified at its inception if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime." *United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) *cert. denied*, 132 S. Ct. 278 (2011) (internal quotation marks omitted). We evaluate the totality of the circumstances to determine whether "the detaining officer had a 'particularized and objective basis' for suspecting legal wrongdoing." *Cortez v. McCauley*, 478 F.3d 1108, 1123 (10th Cir. 2007) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "[T]he ultimate assessment of reasonable suspicion depends on the totality of the circumstances [and] [i]n making that determination, a court may not evaluate and reject each factor in isolation." *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003) (citing *Arvizu*, 534 U.S. at 274-75).

Police officers must have more than a "hunch" to justify stopping an individual, but "the likelihood of criminal activity need not rise to the level

required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274. We have held that "as long as [the detaining officer] has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004) (emphasis in original). We apply an objective standard to determine whether the "facts available to the officer at the moment of the seizure or the search [would] warrant a man of reasonable caution in the belief that the action taken was appropriate." *Terry*, 392 U.S. at 22 (internal quotation marks omitted). Due to their "experience and specialized training," we "accord deference to an officer's ability to distinguish between innocent and suspicious actions." *Gandara-Salinas*, 327 F.3d at 1130. "Moreover, reasonable suspicion may be supported by an objectively reasonable good faith belief even if premised on factual error." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (internal quotation marks omitted).

### *A.*

Mr. Madrid first claims the district court clearly erred in finding Lt. Stoyell was unaware that a physical fight had not actually transpired in the Rinaldi Apartments parking lot when he detained Mr. Madrid. To be clearly erroneous, "a finding must be more than possibly or even probably wrong; the error must be

pellucid to any objective observer." *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007). "[W]e will reverse the district court's finding only if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Keys Youth Services, Inc. v. City of Olathe*, 248 F.3d 1267, 1274 (10th Cir. 2001) (internal quotation marks omitted).

Mr. Madrid cannot meet this high standard. The 911 dispatcher informed Lt. Stoyell in the minutes before he stopped Mr. Madrid that two men "may be starting a fight," that "two males are yelling at each other and [are] in each other's face right now," and that dispatch had changed the code from "suspicious subject" to "fight." *See* Supp. Rec. vol. I at 1. While it is true that only a couple of minutes elapsed between the unknown caller reporting a fight was imminent and Lt. Stoyell arriving on the scene, an argument can escalate to a physical fight in a matter of seconds. Accordingly, there is sufficient evidence to support the court's finding that when Lt. Stoyell stopped Mr. Madrid, he was unaware a physical fight had not actually occurred.

### *B.*

Mr. Madrid also asserts the court should not have considered Mr. Madrid's attempted exit from the parking lot in its reasonable suspicion analysis because neither police officer specifically testified he believed Mr. Madrid was fleeing the parking lot in order to evade the police. The subjective beliefs of the detaining

officers, however, are irrelevant. "An action is reasonable under the Fourth Amendment, regardless of the individual officer's state of mind, as long as the circumstances, viewed *objectively*, justify the action." *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006) (internal quotation marks and brackets omitted) (emphasis in original). Both this court and the Supreme Court have held that a suspect's unprovoked flight and other evasive behavior upon noticing police officers is a pertinent factor in determining reasonable suspicion. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *accord United States v. McHugh*, 639 F.3d 1250, 1258 (10th Cir. 2011). Accordingly, the district court did not err in considering Mr. Madrid's attempted exit from the parking lot just after a police car drove by in its reasonable suspicion analysis.

## *C.*

Mr. Madrid further contends the district court erred by failing to take into account the relatively minor nature of the crimes being investigated in assessing whether Lt. Stoyell had reasonable suspicion to stop him. "Following the Supreme Court's approach in *Henley*, we determine the constitutionality of an investigatory stop by balancing 'the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion.'" *United States v. Moran*, 503 F.3d 1135, 1141 (10th Cir. 2007) (quoting *United States v. Hensley*, 469 U.S. 221, 228 (1985)).

Regarding the "nature and quality of the intrusion" on Mr. Madrid's

personal security, "[a]n investigatory stop is by definition 'brief' and 'non-intrusive.'" *Id.* at 1143 (quoting *United States v. Johnson*, 364 F.3d 1185, 1188 (10th Cir. 2004)); *see also United States v. Griffin*, 7 F.3d 1412, 1516 (10th Cir. 1993) (explaining that a *Terry* stop is "usually characterized as a brief, nonintrusive detention").  Here, the officers stopped Mr. Madrid's car, shined their lights through the windows for officer safety reasons, and requested his license, registration, and proof of insurance.  This was no more intrusive than an ordinary traffic stop.  The detention was prolonged only because probable cause subsequently developed for the officers to believe that Mr. Madrid was a felon in possession of a firearm.

In addition, the government's interest in "solving crimes and bringing offenders to justice . . . [was] particularly strong [because] the criminal activity involve[d] a threat to public safety." *Moran*, 503 F.3d at 1142.  The impetus for the 911 call that led to the investigatory stop was the caller's worry for the safety of his fiancée, whom he believed would be threatened because it appeared that Mr. Madrid was about to engage in a physical fight in the parking lot.  When the stop was initiated, Lt. Stoyell did not know whether a fight had in fact occurred or whether anyone had been injured.  As we explained in *Moran*, "the governmental interest in solving crime may be weaker when police have alternative methods of investigating the crime," *id.*, but here no such alternative methods were reasonably available.  Given an objectively reasonable belief that a fight had just

occurred and the participants were "scattering," a brief investigative stop of a suspected participant in the fight who was attempting to leave the scene would be the most logical and one of the only plausible investigative methods to pursue. And as we further stated, there is a stronger governmental interest in stopping "an individual in the process of violating the law or a suspect fleeing from the scene of a crime than a suspect in a past crime who now appears to be going about his lawful business." *Id.* at 1143 (internal quotation marks omitted); *see also id.* at 1142 ("[B]ecause [the defendant] had allegedly committed the [crime] just minutes before the officers stopped him, the governmental interest in solving the crime was strong.").

In sum, the intrusion on Mr. Madrid's personal security was brief and minimal, and the government had a strong interest in solving crime and ensuring public safety in the circumstances the officers faced here.

### D.

Finally, Mr. Madrid claims the district court erred both in determining that the anonymous 911 call was reliable and in finding that the tip gave rise to reasonable suspicion to stop his vehicle. "A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." *United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir. 1997); *accord United States v.*

*Samuels*, 493 F.3d 1187, 1191 (10th Cir. 2007); *see also Florida v. J.L.*, 529 U.S. 266, 270 (2000) ("[T]here are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.") (internal quotation marks omitted).

The determination of "[w]hether a tip provides reasonable suspicion to make a traffic stop is case-specific," and no single factor is dispositive. *United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011).

> [R]elevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*Id.*; *accord United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007) (considering these factors and concluding information from unidentified 911 caller was sufficiently reliable to establish reasonable suspicion); *United States v. Brown*, 496 F.3d 1070, 1078-79 (10th Cir. 2007) (same); *see also J.L.*, 529 U.S. at 274 (Kennedy, J., concurring) ("[T]here are many indicia of reliability respecting anonymous tips . . . .").

Turning to the first of these factors, "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, an anonymous tip alone seldom demonstrates

-13-

the informant's basis of knowledge or veracity." *J.L.*, 529 U.S. at 270 (internal quotation marks and citation omitted). In *United States v. Johnson*, 364 F.3d 1185 (10th Cir. 2004), we further explained that "[a] tipster who refuses to identify himself may simply be making up the story, perhaps trying to use the police to harass another citizen." *Id.* at 1190. On the other hand, jeopardizing one's anonymity creates "disincentive for making false allegations." *United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002). *See also Copening*, 506 F.3d at 1247 ("The fact the caller provided authorities some basis for discovering his identity makes it less likely his tip was phony.").

The government argues that the unidentified caller here was not truly anonymous because he was likely in the parking lot or nearby when officers arrived on the scene and officers could have questioned bystanders to determine who had placed the 911 call. The government also asserts it is likely that either the caller or his fiancée lived in the apartment complex, which may also have enabled police officers to identify him. Although the caller did not give his name, the 911 operator never requested it. It is unclear from the record whether or not the number he called from was blocked, but we will assume, *arguendo*, that it was.

The characteristics of the call highlighted by the government do make the caller marginally less "truly anonymous" than the unrecorded tip made from an unknown location in *J.L.*, where the informant failed to provide any information

-14-

about himself or the basis for his knowledge. *See J.L.*, 529 U.S. at 268 (holding an anonymous, undocumented and unrecorded telephone call indicating a young black male in a plaid shirt standing at a particular bus stop was carrying a gun, without more, was unreliable and therefore insufficient to justify a *Terry* stop of the defendant). It is quite possible, however, that the caller left the parking lot once he saw Mr. Madrid and his companions leaving the scene and the police arriving, because he no longer needed to worry for his fiancée's safety. That would leave only the assumption that the caller or his fiancée *might* live in the apartment complex to support the possibility the police could identify the caller. Neither the size of the Rinaldi apartment complex nor the number of residents is established in the record.

Our cases addressing this issue have presented significantly more information about the identity of the unnamed caller. For example, in *United States v. Brown*, 496 F.3d 1070 (10th Cir. 2007), a 911 caller did not provide his name but did relate that he was a friend of the alleged victim and was present when an armed man entered the alleged victim's apartment. We distinguished this tip from the truly anonymous caller in *J.L.* because "[a]lthough the police did not know the caller's name . . . they knew enough about him to reasonably believe they could locate him had his call been simply intended to harass [the defendant]." *Id.* at 1076. Similarly, in *Chavez*, "although the caller did not provide dispatchers with his name, he told them he was a Wal-Mart employee at a

specific Wal-Mart store and thereby provided the police with information to discover his identity." 660 F.3d at 1222; *see also United States v. Torres,* 534 F.3d 207, 212 (3d Cir. 2008) (although 911 caller did not give his name, the fact that he told dispatcher he was driving a green cab for a specific taxi company "further supported the reliability of his tip"). As we explained in *Brown*, "[a]n unnamed individual who divulges enough distinguishing characteristics to limit his possible identity to only a handful of people may be nameless, but he is capable of being identified and thus is not anonymous." 496 F.3d at 1075.

The scant information officers had regarding the unnamed caller in the instant matter is a far cry from the identifying information police had in *Brown* and *Chavez*. Nor is the information about the caller comparable to cases where an unnamed informant called 911 from an unblocked phone number. *See Copening*, 506 F.3d at 1247 (holding 911 call from unblocked cell phone number supported reasonable suspicion for investigative stop where caller refused to give his name, in part because "[t]he caller should have expected that 911 dispatch tracks incoming calls and that the originating phone number could be used to investigate the caller's identity."). The tenuous possibility that the police could have identified the 911 caller in the instant matter falls closer to the truly anonymous tip in *J.L.* than to the unnamed but not truly anonymous calls in cases like *Chavez*, *Brown* and *Copening*.

To assess the reliability of a tip, however, we must examine "the totality of

the circumstances—the whole picture," *Sokolow*, 490 U.S. at 8 (internal quotation marks omitted), and "no single factor is dispositive." *Chavez*, 660 F.3d at 1222. A 911 caller who offers only "minimal" identifying information—that he was at or in front of an address across the street from where shots were fired—is not "completely unidentifiable;" giving the address was at least an "indicium of reliability." *Robinson v. Howes,* 663 F.3d 819, 829 (6th Cir. 2011). Here, the 911 operator never asked the caller for his name or other identifying information and there is no reason to believe he would not have provided this information if requested. *See Torres,* 534 F.3d at 212 (investigative stop supported by reasonable suspicion based, in part, on anonymous 911 call in which "the tipster neither attempted to, nor had any reason to, conceal his identity; the dispatcher simply neglected to ask him his name"). And there is no indication the caller was "making up the story, perhaps trying to use the police to harass another citizen." *Johnson*, 346 F.3d at 1190; *see also Easton v. City of Boulder*, 766 F.2d 1441, 1449 (10th Cir. 1985) ("[T]he skepticism and careful scrutiny usually found in cases involving informants . . . from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness.").

Significantly, all of the other factors that we consider to determine whether a tip provides reasonable suspicion support the caller's reliability. First, it is clear the caller was reporting contemporaneous, firsthand knowledge of the possible fight in the parking lot. As we stated in *Brown*, "[w]e consider it another

-17-

important indicium of reliability that the caller claimed firsthand knowledge of the alleged conduct." *Brown*, 496 F.3d at 1076. Here, as in *Brown*, because "the officers knew that the caller's information was based on firsthand knowledge and that it was contemporaneous[,] [t]hey were reasonable . . . in taking the caller's information more seriously than information obtained, for instance, through the report of a third party or reported sometime later than the described events." *Id.* at 1077.

Second, the caller provided detailed information about the events he was observing, including describing the clothing and automobiles of the individuals involved in the incident. This is another indicium of reliability that we have recognized in our reasonable suspicion analysis of anonymous tips. *See, e.g.*, *Copening*, 506 F.3d at 1247 (unnamed caller's "detailed description" of the alleged criminal activity "bolstered the tip's reliability.").

Third, the caller's stated motivation for calling 911 and reporting the possible fight was a concern for his fiancée's physical safety. This stated motive further buttresses the reliability of the information related by the caller because it reduces the possibility that he harbored animosity towards defendant or his companions and tends to show that he was not using "the device of a phoney tip to wreak injury (indignity, invasion of privacy, suspicion, and sheer annoyance) on [his] enemies, rivals or acquaintances without fear of being held responsible." *United States v. Hauk*, 412 F.3d 1179, 1188 (10th Cir. 2005); *see also Copening*,

506 F.3d at 1247 (stating "an ordinary citizen acting in good faith" in calling 911 indicates reliability); *Brown*, 496 F.3d at 1077 ("[W]e consider it important that the caller's primary motive in contacting 911 . . . was not to implicate the armed man but to obtain aid and protection for his friend.").

Finally, police officers dispatched in response to this call were able to verify much of the information the caller had provided. Although the caller's description of the possible criminal activity of the suspects was not verified by the officers, as they arrived at the scene they did find the two cars matched the descriptions given by the caller, and also that the suspects were in their vehicles and attempting to leave, just as the caller had described. As we recognized in *Copening*, "[t]he officer's corroboration of the latter information, lent credibility to the former. This is particularly true where . . . the caller's asserted basis of knowledge—as to both types of information—was first-hand and real-time observation." *Copening*, 506 F.3d at 1247; *see also Chavez*, 660 F.3d at 1222 (tip's reliability was bolstered by fact that police officers verified some of information caller provided about suspect's non-illegal conduct before making *Terry* stop).

There was no need here for the caller to exhibit "inside knowledge" of the alleged crime because he was not an informant providing a tip about a concealed weapon or contraband based on insider information. He was instead a concerned citizen witnessing a situation in public view that he thought was about to become

a crime and a threat to public safety, who then reported the disturbance to the authorities. *See United States v. Perkins*, 363 F.3d 317, 325 (4th Cir. 2004) (distinguishing between tips regarding alleged possession of concealed firearms that "may require corroboration of the extent of the tipster's inside information, in order to ensure that the tipster was in a position to know about the alleged illegal conduct" and tips "where the suspicious activity is openly and readily observable, [where] other manners of corroborating a tip are entirely legitimate"); *accord United States v. Wheat*, 278 F.3d 722, 734 (8th Cir. 2001) ("Unlike with clandestine crimes such as possessory offenses, . . . where corroboration of the predictive elements of the tip may be the only means of ascertaining the informant's basis of knowledge, in erratic driving cases the basis of the tipster's knowledge . . . comes from his eyewitness observations, and there is no need to verify that he possesses inside information."); *see also United States v. Wooden*, 551 F.3d 647, 650 (7th Cir. 2008) ("A 911 system designed to provide an emergency response to telephonic tips could not operate if the police had to verify the identity of all callers and test their claim to have seen crimes in progress."); *Cf. J.L.*, 529 U.S. at 270-71 (explaining that an anonymous informant would need "inside knowledge" of a suspect for their tip to be reliable regarding "hidden contraband").

Mindful of the "skepticism and careful scrutiny" required in the anonymous-informant context, *Copening*, 506 F.3d at 1247, we conclude,

-20-

considering the totality of the circumstances, that the caller's tip bore "sufficient indicia of reliability to provide reasonable suspicion to make the investigative stop" of Mr. Madrid. *J.L.*, 529 U.S. at 270 (internal quotation marks omitted). The 911 call and corroborated facts provided Lt. Stoyell with a particularized and objective basis for suspecting Mr. Madrid had just been involved in criminal activity. Accordingly, the investigative stop was justified at its inception and was not in violation of the Fourth Amendment.

We **AFFIRM.**