**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**October 18, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JULIUS LEE TURRENTINE,

Defendant-Appellant.

No. 12-6209

(D.C. No. 5:12-CR-00001-HE-1)
(W. D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE,** Chief Judge, **KELLY** and **GORSUCH**, Circuit Judges.

This is a direct appeal by Julius Lee Turrentine following his conviction for

conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in

violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).  Turrentine appeals the district

court's denial of his motion to suppress all evidence obtained following a traffic

stop.  We affirm.

**I.    BACKGROUND**

This case centers around a traffic stop near the mainline toll plaza in

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited,
however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th
Cir. R. 32.1.

Lincoln County, Oklahoma. Oklahoma Highway Patrol Officers Clint Painter and Ty Owen were parked between the toll lanes in separate vehicles. Trooper Painter was driving a Dodge Charger, and Trooper Owen was parked to his right in a Chevrolet Tahoe. The vehicles were side-by-side, facing southwest. At approximately 6:50 a.m., Trooper Painter observed a silver SUV driven by Julius Lee Turrentine fail to signal as it exited the east-bound lanes on the Turner Turnpike onto the mainline toll plaza, in violation of Oklahoma state law. See Okla. Stat. tit. 47, § 11-309(2). Trooper Painter activated his patrol car's emergency lights[1] and stopped Turrentine on the east side of the toll plaza.

Jimmie Johnson, who had rented the SUV, was sitting in the front passenger seat of the SUV that Turrentine was driving. Trooper Painter observed Johnson raise up, turn around to look at him, lie back down in the passenger seat, and then pretend to be asleep. Trooper Painter approached the SUV's passenger side and told Turrentine that he had failed to signal when exiting the turnpike. Turrentine denied that he had failed to signal. Trooper Painter then told Turrentine that he would only receive a warning and directed Turrentine to sit in his patrol car while he prepared the warning.

---

[1] When Trooper Painter activated the emergency lights, a video camera in his car automatically began recording the area directly in front of the patrol car and the patrol car's cabin area. The video camera also recorded video-only footage a minute before and a minute after the emergency lights were activated. This video footage was submitted at the suppression hearing and is part of the record on appeal. In the video-only footage shot before Trooper Painter activated his emergency lights, Trooper Painter is seen smiling and laughing.

While Trooper Painter and Turrentine sat in the patrol car, Trooper Painter checked Turrentine's driver's license and asked Turrentine about the two men's travels. Turrentine stated that he and Johnson left for Las Vegas on the previous Saturday, arrived in Las Vegas on Sunday or Monday, went straight to the casino where they gambled for a couple of days, and then started driving home to St. Louis. After further questioning, Turrentine stated that the two men had gambled "all over" in Vegas for forty-eight hours straight, despite not having brought much money nor having won any money while gambling. He also stated that they slept in the SUV in a Hampton Inn parking lot.

Trooper Painter walked back to the SUV to request the rental agreement from Johnson, who was still pretending to be asleep. Trooper Painter asked Johnson about the two men's travels. Johnson said that they had been visiting Turrentine's people in Oklahoma City for a "couple days." Trooper Video at 10:12 to 10:20. Trooper Painter asked if the two men had been anywhere else. Johnson stated that they had not.

Trooper Painter returned to his patrol car and asked Turrentine whether the two men had stayed anywhere else besides Las Vegas. Turrentine responded that they had not. After handing Turrentine the warning citation, Trooper Painter said the stop was complete. As Turrentine was about to leave, however, Trooper Painter asked Turrentine if he would answer a few more questions. Turrentine said he would not. Trooper Painter then told Turrentine that he and Johnson were

3

being detained because of the discrepancies in their stories and their unusual nervousness. Trooper Painter then contacted Trooper Owen, who had a trained narcotics dog. Within minutes, Trooper Owen arrived with the trained narcotics dog. The dog alerted, and the resulting search revealed nearly eleven kilograms of powder cocaine hidden inside the SUV.

Turrentine filed a motion to suppress all evidence from the traffic stop. At the suppression hearing, the district court reviewed video footage from Trooper Painter's patrol car and heard testimony from Trooper Painter, Trooper Owen, George Rawlins, and Brett Weber. George Rawlings, an investigator with the federal public defender's office, testified that it would have been difficult, if not impossible, for Trooper Painter to have seen Turrentine's traffic violation because Trooper Painter's view was obstructed by Trooper Owen's patrol car. In response, Trooper Painter testified that he in fact had seen the traffic violation. Trooper Painter also testified that he thought the two men were engaged in criminal activity for several reasons, including the fact that Johnson pretended to be asleep when Trooper Painter first stopped the SUV, both men appeared to be nervous, their respective descriptions of their prior travels were inconsistent, and Turrentine failed to make eye contact when speaking to Trooper Painter.

The district court issued a written order denying Turrentine's motion to suppress. A jury convicted Turrentine of conspiracy to possess with intent to distribute 5 kilograms or more of cocaine in violation of 21 U.S.C. §§ 846 and

4

841 (b)(1)(A).  Because Turrentine had a prior felony drug conviction, the district court sentenced him to the mandatory minimum of 20 years' imprisonment.

## II.    DISCUSSION

Turrentine argues that the district court erred by denying his motion to suppress because Officer Painter could not have observed the traffic violation, there was no reasonable suspicion for detaining him, and the dog alert was insufficient to justify a warrantless search of the vehicle.  At oral argument, counsel for Turrentine withdrew the dog alert issue, noting the Supreme Court's recent decision in Florida v. Harris, 133 S.Ct. 1050 (2013) (a dog alert provides a police officer with probable cause to conduct a search when "all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime").

In reviewing the denial of a motion to suppress, "we view the evidence in the light most favorable to the government, accept the district court's findings of fact unless clearly erroneous, and review *de novo* the ultimate determination of reasonableness under the Fourth Amendment."  United States v. Polly, 630 F.3d 991, 996 (10th Cir. 2011) (quotation omitted).

### A.    Legal Framework

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and

5

seizures." U.S. Const. amend. IV. A seizure occurs when "a reasonable person would not feel free to leave or disregard the contact." Lundstrom v. Romano, 616 F.3d 1108, 1119 (10th Cir. 2010) (citing Petersen v. Farnsworth, 371 F.3d 1219, 1221-22 (10th Cir. 2004)). To determine whether a seizure is constitutional, we balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion," Weigel v. Broad, 544 F.3d 1143, 1162 (10th Cir. 2008) (quoting Scott v. Harris, 550 U.S. 372, 383 (2007)). The reasonableness of the police officer's actions is evaluated from the perspective of a reasonable officer at the scene. Lundstrom, 616 F.3d at 1120.

Although a traffic stop is a Fourth Amendment seizure, it ordinarily is analyzed as an investigative detention under Terry v. Ohio, 392 U.S. 1 (1968). United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995) (en banc). Terry requires we examine whether the stop was: (1) "justified at its inception," and (2) "reasonably related in scope to the circumstances which justified the interference in the first place." Id. at 20. Throughout this analysis, we are guided by the "touchstone" of reasonableness. Florida v. Jimeno, 500 U.S. 248, 250 (1991). If the stop fails the two-pronged Terry test, the stop becomes an arrest that must be supported by probable cause. Lundstrom, 616 F.3d at 1120 (citing United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1227 (10th Cir. 2008)). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an

6

observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." Botero-Ospina, 71 F.3d at 787.

## B.    Initial Stop

Turrentine first contests the legality of the traffic stop.  He argues that the district court erred in denying his motion to suppress because "[t]he facts elicited at the suppression hearing show by clear and convincing evidence that Trooper Painter was not in a position to see whether Mr. Turrentine failed to signal his exit off of the turnpike onto the toll plaza because his view was obstructed by Trooper Owen's vehicle." Aplt. Br. at 13.  Turrentine also contends that the stop was racially motivated. Id. at 11.

The district court's ruling that Trooper Painter could see Turrentine's failure to signal is a factual finding that is reversible only if the district court committed clear error. See United States v. Madrid, 713 F.3d 1251, 1255 (10th Cir. 2013).  When reviewing the district court's factual findings, we view evidence in the light most favorable to the government. Id.  Under the clearly erroneous standard, we "'will reverse the district court's finding only if it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made.'" Id. at 1256-57 (quoting Keys Youth Servs., Inc. v. City of Olathe, 248 F.3d 1267, 1274 (10th Cir. 2001)).

Turrentine's challenge to the district court's factual finding does not overcome this high bar. Certainly, he provided some evidence indicating Trooper Painter's view was obstructed and that, as a result, he could not have observed the traffic violation. In his analysis, Rawlings employed the height of Trooper Painter and Trooper Owen's patrol cars, the location of the two vehicles, and Painter's behavior in the video to determine whether it was physically possible for him to see past Trooper Owen's vehicle. However, this analysis was based on the video, not first-hand knowledge, and used several assumptions about the positioning of the officers and their vehicles. Rawlings acknowledged that Trooper Painter could have seen the toll exit "if he was pulled far enough ahead." R., Vol. 3 at 339-40. This evidence was countered by Trooper Painter's testimony. Trooper Painter testified at the suppression hearing that he directly observed Turrentine commit a traffic violation. The district court found Trooper Painter's testimony generally credible and discounted the value of Rawlings' testimony. As the district court noted, although Rawlings' testimony may have raised a "reasonable doubt," the applicable standard was "whether the government has established by a *preponderance of the evidence* that the violation occurred, hence justifying the trooper's action." R., Vol. 1 at 133 (emphasis added). On the record presented, it was not clear error for the district court to accept Trooper Painter's testimony over the contrary evidence presented by Rawlings.

Turrentine also argued that Trooper Painter's stop was racially motivated,

8

but he did not develop this theory or provide any case law to support his claim.[2]

When a party does not cite a single case to support its position, "we are free to end our inquiry by applying the principle that arguments inadequately briefed in the opening brief are waived." United States v. Pursley, 577 F.3d 1204, 1228 (10th Cir. 2009) (quotation omitted).

We conclude that the district court did not err in finding that Trooper Painter observed Turrentine commit a traffic violation, which justified the traffic stop from its inception.

## C.     Subsequent Detention

Turrentine also argues that the troopers exceeded the scope of the traffic stop because "there was not reasonable suspicion to believe there was criminal activity afoot and Mr. Turrentine should have been allowed to go on his way after Trooper Painter gave him the warning." Aplt. Br. at 16-17.

A lawful traffic stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." Terry, 392 U.S. at 20. Under this standard, the detention "usually must 'last no longer than is

---

[2] At the suppression hearing, Turrentine introduced evidence that out of 254 unsafe lane change warnings that Trooper Painter issued from July 2011 through November 2011, 79 of the warnings were issued to persons with Hispanic or Asian names. Turrentine had made an ex parte request for a subpoena duces tecum to the Department of Public Safety for copies of citations or warnings issued by Trooper Painter to determine the racial make-up of the people to whom he gave warnings. The district court denied Turrentine's request. Turrentine does not appeal this denial.

necessary to effectuate the purpose of the stop,' and 'the scope of the detention must be carefully tailored to its underlying justification.'" United States v. Hunnicutt, 135 F.3d 1345, 1349 (10th Cir. 1998) (alteration omitted) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)).  "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." Illinois v. Caballes, 543 U.S. 405, 407 (2005).  However, a "traffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity."  United States v. Kitchell, 653 F.3d 1206, 1217-18 (10th Cir. 2011) (quotations omitted).

Trooper Painter explained that he believed criminal activity was afoot because of Turrentine and Johnson's displayed nervousness and their very different descriptions of their travels.  Trooper Painter also noted that both Turrentine and Johnson displayed visible signs of nervousness including heavy breathing.  Trooper Painter also thought it was suspicious that Johnson pretended to be asleep when Trooper Painter first approached the SUV and again when Trooper Painter approached him to ask for the rental agreement.  In addition, Trooper Painter noted that Turrentine failed to make eye contact with him while the two were talking.

10

Turrentine argues that Trooper Painter's observations do not support an inference of criminal activity. Turrentine points out that both men are overweight and out of shape, so it would not be unusual for them to be breathing heavily. Turrentine contends that it is not suspicious for a car passenger to be asleep so early in the morning. Turrentine refuted the eye contact allegation at the suppression hearing with testimony from Brett Weber, an information technology employee at the federal public defender's office. Weber testified that based on stills of the video shot from Trooper Painter's patrol car, Turrentine looked at Trooper Painter a total of twelve times without Trooper Painter looking back, Trooper Painter looked at Turrentine a total of eight times without Turrentine looking back, and both men made eye contact eleven times during the conversation.

The district court found that Trooper Painter had a reasonable basis to extend the detention based on the "clearly contradictory" travel stories and "Johnson's efforts to feign sleep." R., Vol. 1 at 134. The district court did not rely on the alleged visible signs of nervousness and lack of eye contact. Accordingly, we need not consider Turrentine's arguments relating to those issues. The district court's findings are not clearly erroneous. "We have repeatedly stated that 'as part of a legitimate traffic stop' an officer may ask a motorist about his or her travel plans." Kitchell, 653 F.3d at 1219 (quoting United States v. Santos, 403 F.3d 1120, 1132 n.6 (10th Cir. 2005)). Further,

11

"[t]he motorist's or his passengers' inconsistent statements in response to such questions can give rise to reasonable suspicion of criminal activity." Id. At the suppression hearing, Trooper Painter testified that he suspected potential criminal activity because he believed the two men "were being very evasive" and provided "[t]otally different stories." R., Vol. 3 at 285. When Trooper Painter asked Turrentine where the two men were coming from, Turrentine stated that they were driving back from Las Vegas. When asked the same question, Johnson stated that they had come from Oklahoma City and that they had not gone anywhere else. Turrentine then denied having visited anywhere but Las Vegas. Despite Turrentine's argument to us to the contrary, these two stories are clearly inconsistent. The district court did not err in finding that Trooper Painter had reasonable suspicion to further detain Turrentine, which renders the subsequently obtained evidence admissible.

AFFIRMED.

Entered for the Court


Mary Beck Briscoe
Chief Judge

12