TYMKOVICH, CJ., dissenting.
*804 I would affirm the district court because Officers Rowland and Davis had reasonable suspicion to perform a brief investigative stop. And Officer Rowland quickly gained probable cause to arrest Gaines based on the open container plainly visible inside Gaines's vehicle. Although the majority thoroughly and persuasively analyzes the existence of a seizure and the applicability of the attenuation doctrine, I would not reach these two issues. I therefore dissent.
I see no need to remand for the district court to determine reasonable suspicion, despite the district court not reaching the issue below. The government squarely presented the issue to the district court and developed a detailed record regarding the officers' knowledge and observations. And based on this record, the officers had reasonable suspicion to detain Gaines briefly while they investigated possible criminal activity.
We may affirm on an alternative ground when the facts in the record are sufficiently developed and clear. See United States v. Springer , 875 F.3d 968, 981 (10th Cir. 2017) ("[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." (internal quotation marks omitted)). And we should do so when, as here, an issue will almost certainly return on appeal. I would therefore exercise our discretion to affirm on this alternative ground, which is more than "adequately supported by the record." Davis v. Roberts , 425 F.3d 830, 834 (10th Cir. 2005).
The Fourth Amendment permits brief investigative stops when law enforcement officers have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez , 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). Whether officers have reasonable suspicion depends "upon both the content of information possessed by police and its degree of reliability." Alabama v. White , 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990). The standard takes into account "the totality of the circumstances," Cortez , 449 U.S. at 417, 101 S.Ct. 690 -all the information officers possessed. Although a mere hunch does not create reasonable suspicion, the level of suspicion required is "considerably less than proof of wrongdoing by a preponderance of the evidence." United States v. Sokolow , 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989).
In this case, the officers responded to a 911 call that exhibited adequate indicia of reliability. Combined with their knowledge of PCP-related drug activity at the address and in the immediate area, a brief investigative stop was fully justified.
The Supreme Court has noted that "[a]n anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," Navarette v. California , 572 U.S. 393, 397, 134 S.Ct. 1683, 188 L.Ed.2d 680 (2014), so an anonymous tip is consequently seldom enough for reasonable suspicion. But the Court has held, "under appropriate circumstances, an anonymous tip can demonstrate sufficient indicia of reliability to provide reasonable suspicion to make [an] investigative stop." Id. (internal quotation marks omitted). Thus, the Court has held that an anonymous tip can suffice for reasonable suspicion, given some indicia of *805 reliability, though generally some additional information is needed. In this case we have both.
The Supreme Court has plainly held that not all anonymous tips give police reasonable suspicion to make an investigative stop. In Florida v. J.L. , 529 U.S. 266, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000), police received an anonymous phone call alleging that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun," id. at 268, 120 S.Ct. 1375. The call itself did not exhibit any signs of being reliable-there was "no audio recording of the tip, and nothing [was] known about the informant"-so "[a]part from the tip, the officers had no reason to suspect" the young man of any illegal conduct. Id. Under these circumstances, the Court unanimously held that the officers lacked reasonable suspicion to frisk the defendant for weapons.
More recently, however, the Supreme Court has under different circumstances found an anonymous tip sufficient under the Fourth Amendment. See Navarette , 572 U.S. at 393, 134 S.Ct. 1683. The police in Navarette received a 911 emergency call stating that a vehicle had just run the caller off the road. The caller provided the dispatcher with the license plate number, which police used to locate and stop the vehicle. The Court found three factors especially relevant: the tipster (1) "claimed eyewitness knowledge of the alleged dangerous driving," (2) "reported the incident soon after she was run off the road," and (3) "use[d] the 911 emergency system." Id. at 399-400, 134 S.Ct. 1683 ; see also United States v. Chavez , 660 F.3d 1215, 1222 (10th Cir. 2011) (laying out similar considerations).
Here, the informant appears to have personally observed Gaines conducting a drug transaction, but we cannot assume that fact when the record is inconclusive. The majority is correct that this is a disputed fact because the caller never explicitly says how he knows of the illegal conduct. The caller was certainly personally observing Gaines while on the phone with the 911 operator and noted that Gaines "just made about 20 dollars." Gov't Ex. 1 at 0:46-48. And he knew how Gaines was dressed and where he had parked his car. But we ultimately cannot be sure the tipster was in a similar position to the caller in Navarette .
We have no need to rely on this disputed fact, however, because the claim of eyewitness knowledge is only one indicium of reliability. It cannot be dispositive in either direction because officers have even less ability to confirm a tipster's claim of personal knowledge than other aspects of an anonymous call. And the other two relevant considerations are present. The caller made a "contemporaneous report" of his observations of Gaines's activities, criminal or not, and the caller used the 911 system. Navarette , 572 U.S. at 399-400, 134 S.Ct. 1683. The anonymous call also contained several other indicia of reliability.
The anonymous tipster described his observations to the emergency operator as he saw them, stating clearly, "I'm watching him right now." Gov't Ex. 1 at 1:39-41. This information is the "sort of contemporaneous report [that] has long been treated as especially reliable." Navarette , 572 U.S. at 399, 134 S.Ct. 1683. This is because "substantially contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." Id. at 400, 134 S.Ct. 1683 (citing Advisory Committee's Notes on rule of evidence 803(1), which describes "the rationale for the hearsay exception for 'present sense impression[s]' "). Granted, the caller here does not describe any criminal activity contemporaneously with his observations. This *806 weakens the reliability of the criminal allegations. But the contemporaneousness of the caller's noncriminal information increases the overall reliability of the tip because the tipster reported mostly present sense impressions, which "weigh[s] in favor of the caller 's veracity." See id. (emphasis added). And an anonymous caller's veracity is at least part of the overall reliability inquiry.
Also significant is the caller's use of the 911 emergency system. As the Supreme Court reasoned in Navarette , "A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." Id. For instance, a recorded call "provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution," and FCC regulations prohibit carriers from allowing callers to "block call recipients from obtaining their identifying information." Id. at 400-01, 134 S.Ct. 1683. This does not "suggest that tips in 911 calls are per se reliable," but it does mean that a tipster's use of the 911 system is "one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call."[1] Id. at 401, 134 S.Ct. 1683.
In this case, moreover, we have several other indicia of reliability. First, the caller told the 911 operator where he was. His first words were, "Uh yes, I'm down here at uh Frank Gill Center ... Frank Williams Center." Gov't Ex. 1 at 0:02-07. He later confirmed this location by exiting the building briefly to verify and report the exact address where he was located. See United States v. Madrid , 713 F.3d 1251, 1260 (10th Cir. 2013) ("giving the address" where the crime took place and the caller's own location "was at least an indicium of reliability") (internal quotation marks omitted). This, combined with the use of the 911 emergency system, jeopardized his anonymity, which created a "disincentive for making false allegations." United States v. Jenkins , 313 F.3d 549, 554 (10th Cir. 2002) ; see also United States v. Copening , 506 F.3d 1241, 1247 (10th Cir. 2007) ("The fact the caller provided authorities some basis for discovering his identity makes it less likely his tip was phony.").
Second, the caller spent over two minutes on the phone with the 911 operator and answered every question put to him. When the operator asked what type of car Gaines was driving, the caller answered honestly that he did not know but continued, "I can tell ya if you wait." Gov't Ex. 1 at 1:36-37. He also took the time to verify the address of the building where the police needed to go.
Third, the caller did not decline to give his name; the 911 operator simply never asked. This is certainly an indicium of reliability. See Madrid , 713 F.3d at 1260 (finding significant that "the 911 operator never asked the caller for his name or other identifying information and there [was] no reason to believe he would not have provided this information if requested"); United States v. Torres , 534 F.3d 207, 212 (3d Cir. 2008) (same). Again, these considerations do not make tips reliable per se . But a reasonable officer could find an anonymous tip fairly credible when the caller reveals where he is located, jeopardizing his anonymity; does not decline to give any information, especially identifying *807 information; and does not seem in any hurry to make an allegation and hang up.
The officers also had information beyond the anonymous (yet sufficiently reliable) tip on which to rely. They had first-hand officer observation and knowledge. The officers knew which person in the parking lot had been accused of drug dealing: another officer, Officer Wilcox, who at the time was off-duty at the Center, radioed in that the man getting into the Cadillac was the person who had been standing on the street corner dressed in all red when the tipster called. Thus, the officers could be confident that Gaines was the person the caller had accused of criminal activity. See Cortez , 449 U.S. at 417-18, 101 S.Ct. 690 (officers must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity" (emphasis added)).
In addition, the officers had personal knowledge of drug, and specifically PCP-related, activity in the immediate area of the Wilhelmina Gill Center. See United States v. DeJear , 552 F.3d 1196, 1201 (10th Cir. 2009) ("[T]he fact that conduct occurs in an area known for criminal activity [is an] appropriate factor[ ] to consider in determining whether reasonable suspicion exists."). Officer Rowland testified at length at the suppression hearing regarding his knowledge of drug activity near the Center. Officer Davis also testified that she was aware of "a lot of medical-type calls of individuals on PCP, along with complaints of narcotics sales in the area." R., Vol. I at 192.
Gaines now claims that the two officers' knowledge of drug activity at the Center and the immediate area is a disputed issue of fact that must be resolved by the district court. But the officers' testimony that each was aware of this drug activity is unequivocal-and unrefuted.
Officer Rowland laid foundation for a government exhibit that revealed eight police reports to the exact address for drug-related medical treatment that calendar year. The police reports confirm officers had been called to the address for drug overdoses three times in the two months prior to Gaines's arrest. Two of those reports specifically mention that the person receiving treatment had taken or had likely taken PCP, the specific drug the anonymous tipster identified.
Officer Rowland also testified extensively about his personal knowledge of these events. He told the court he had personally "responded to calls for service" in the immediate area of the Wilhelmina Gill Center for various things but certainly for "a lot of narcotics complaints." R., Vol. I at 151-52, 154. The officer testified that leading up to the day of the arrest "[w]e had an increased contact with individuals under the influence of PCP." Id. at 152. He continued, police received "[n]umerous medical calls, sometimes multiple within a few minutes in that general area of individuals exhibiting behavior that they were under the influence of PCP .... So we would usually respond, whether it be a police call or a medical call." Id.
We may rely on this record evidence based on the district court's findings of fact and the record evidence. The district court specifically found that Officer Rowland "was familiar with the Wilhelmina Gill Center and the surrounding area" and "had responded to several drug-related calls" at the Center. R., Vol. I at 136. The court also found that "officers had been dispatched to the Wilhelmina Gill Center eight times ... for medical calls involving reactions to PCP or other substances." Id. It is true that the district court did not specifically find that the officers were aware of the PCP-related medical calls established in the police records. But *808 Gaines did not challenge the officers' assertion of this personal knowledge at the suppression hearing; he produced no evidence to contradict the officers' testimony and barely questioned them on the issue during cross-examination. Id. at 178-80, 195. The cross-examinations on this point were only to clarify that not all the drug-activity of which the officers knew was specifically PCP related.
The suppression hearing record therefore shows that (1) Officers Rowland and Davis personally responded to service calls in the area of the Center, especially for narcotics complaints; and (2) at least Officer Rowland was aware of the eight police reports he sponsored into evidence of drug related activity at the same address as the arrest happened, including the two service calls for PCP-related drug activity at the Center within two months of Gaines's arrest. This is sufficient evidence to conclude that the officers had additional knowledge, beyond the anonymous phone call, to raise reasonable suspicion that Gaines was selling PCP in the parking lot of the Wilhelmina Gill Center.
Thus, the officers reasonably relied on the anonymous tip in conjunction with their own knowledge because together "the informant's story and the surrounding facts possessed an internal coherence that gave weight to the whole." United States v. Brown , 496 F.3d 1070, 1078-79 (10th Cir. 2007). So even "[e]xercising the significant skepticism and careful scrutiny required in the anonymous-informant context," Copening , 506 F.3d at 1247 (internal quotation marks omitted), I would affirm on grounds of reasonable suspicion.

Gaines's counsel at oral argument contended that a 911 call does not make a tip more reliable because tipsters may use burner phones or other methods to hide detection. But this was no more true in 2015 when this incident occurred than in 2014 when the Supreme Court decided Navarette .