FILED
United States Court of Appeals
Tenth Circuit

November 15, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

CHRISTOPHER MICHAEL
CONNER,

      Defendant - Appellant.

No. 12-1063

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 1:11-CR-00193-MSK-1)**

---

John T. Carlson, Assistant Federal Public Defender, (and Raymond P. Moore, Federal Public Defender, on the briefs), Denver, Colorado, for Defendant - Appellant.

Ryan T. Bergsieker, Assistant United States Attorney, (and John F. Walsh, United States Attorney, on the brief), Denver, Colorado, for Plaintiff - Appellee.

---

Before **KELLY**, **TYMKOVICH**, and **GORSUCH**, Circuit Judges.

---

**KELLY**, Circuit Judge.

      Defendant-Appellant Christopher Michael Conner entered a conditional

plea to being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1), reserving

the right to appeal the denial of his motion to suppress.  He was sentenced to 28 months' imprisonment followed by three years' supervised release.  On appeal, he argues that the officers who stopped and frisked him based upon an anonymous tip violated the Fourth Amendment.  Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

At approximately 11:00 p.m. on April 29, 2011, a man called 911 to report that a light-skinned black male, wearing a fuzzy hunter hat, had exited a black SUV and placed a pistol in his waistband.  2 R. 84.  The caller indicated that this had occurred after he heard someone yelling, "No, no."  Id.  The caller provided both his address and his phone number.  Aplt. Open. Br. Attach. 4.

The caller stated that the black SUV was parked in the alley between Larimer and Lawrence Streets in Denver, on the north side of 22nd Avenue.  Id. After taking this information, the operator relayed the caller's report through the police dispatch system.  2 R. 84.  Officers Brian Snow and Kipp Terry received the following dispatch:

| Police Dispatch: | 2200 Larimer. . . .  Caller says there's in the alley between Larimer and Lawrence there's a black SUV parked up on the north side on 22nd.  Believes the driver may have a gun.  Caller heard someone yelling no no and then the driver got out of the car and put the gun in his waistband.  Black male, light skin.  Fuzzy hunting hat and (inaudible) shirt and jeans. |
| --- | --- |
| Officer: | (Inaudible) . . . phone number of the (inaudible). |

Police Dispatch: (Inaudible) down the line but it's a 720–956-0148. Aplt. Open. Br. Attach. 4.

At the time, the officers had been patrolling a precinct considered one of the most dangerous due to frequent stabbings and shootings. 2 R. 84. In fact, Officers Snow and Terry testified that there had been a shooting or stabbing in the same area two nights before. Id. at 89. The officers feared that a person yelling, "No, no," coupled with the sighting of a weapon, indicated that a gun had been pointed at someone. Id.

Upon arrival, the officers observed a black SUV in the exact location that the caller had given. Id. at 84. They also spotted Mr. Conner: a black male wearing a fuzzy hunting hat, just as the caller had described, who was walking away from the location of the SUV. Id. at 84–85.

Officer Snow positioned his patrol car to block Mr. Conner's path. Id. at 85. The officer testified that "[i]t appeared to me like he was going to run. . . . [I]nstead of just walking down the sidewalk, he turned left into this parking lot to start going that way. . . . [I]t's just a downtown parking lot. There is really no reason to go into that parking lot at that time of night." Id. at 25. Officer Snow remained in his car while Officer Terry approached Mr. Conner. Id. at 85. With his gun drawn, Officer Terry told Mr. Conner to put his hands up; Mr. Conner complied. Id. He proceeded to conduct a pat-down, during which he found a pistol concealed in Mr. Conner's waistband. Id.

In denying Mr. Conner's motion to suppress, the district court determined that the stop was proper.  Id. at 90.  Specifically, the court found that: the stop occurred late at night in a high-crime area; there was a "temporal and geographic association" between someone calling out, "No, no," and the observation of a man putting a handgun in his waistband; and the police corroborated several details of the report.  Id. at 89–90.  Therefore, the district court concluded that the tip was sufficiently reliable and, further, the tip provided officers with a reasonable suspicion of criminal activity.  Id.

One housekeeping matter.  In his opening brief, Mr. Conner refers to the audio recording of the 911 call, and included a transcript of the call.  However, neither the recording nor its transcript was introduced during the suppression hearing.  Mr. Conner acknowledges this and tells us that "the district court refused to accept exhibits at the hearing."  Aplt. R. Br. at 1.  A look at the hearing transcript shows that he moved to admit "Exhibit 1," a map, and in response, the district court stated that "[t]he Rules of Evidence do not apply in suppression hearings pursuant to Rule 1101.  Whatever you'd like to offer, but since the Rules of Evidence don't apply I don't specifically receive exhibits."  2 R. 34.

It is true that "the rules of evidence normally applicable in criminal trials do not operate with full force at hearings before the judge to determine the admissibility of evidence."  United States v. Matlock, 415 U.S. 164, 172–73 (1974) (discussing Fed. R. Evid. 104(a) & 1101(d)(1)).  But this principle is based

- 4 -

on the assumption that more evidence should be included in a pretrial hearing because the judge, unlike a jury, can give the evidence "such weight as his judgment and experience counsel." Id. at 172, 175 (reversing the district court's exclusion of hearsay evidence); see also United States v. Merritt, 695 F.2d 1263, 1270–71 (10th Cir. 1982) (holding that the excluded evidence required a finding of reasonable suspicion). Insofar as suppression hearings are not constrained by some of the rules of evidence, they compel consideration of relevant but otherwise inadmissible evidence. See United States v. Brewer, 947 F.2d 404, 409 (9th Cir. 1991) ("'What must be meant is that the traditional exclusionary rules do not apply, but that procedural regulation of the process of admission and exclusion remains applicable.'" (quoting 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure: Evidence, § 5953 at 257 (1977))).

No objection was made to the district court's somewhat novel approach of not receiving exhibits. Moreover, counsel never attempted to introduce the 911 call or its transcript. Rule 103 plainly requires the proponent of evidence to have made an offer of proof in order to appeal its exclusion. See Perkins v. Silver Mtn. Sports Club & Spa, LLC, 557 F.3d 1141, 1146–47 (10th Cir. 2009) (citing Fed. R. Evid. 103(a)(2)). Consequently, we do not consider it.

An appellate court will only excuse a failure to meet Rule 103's requirements "in instances of plain error," which affect "substantial rights." See Perkins, 557 F.3d at 1147 (citing Fed. R. Evid. 103(d)). The transcript would not

alter our conclusion that the stop was constitutional.  See Aplt. Open. Br. Attach. 3.  Therefore, because the contents of the call do not affect Mr. Conner's substantial rights, we rely exclusively on the Denver Police Department dispatch and the suppression hearing transcript.

## Discussion

When reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the prevailing party and we accept the district court's factual findings unless they are clearly erroneous.  United States v. Ruiz, 664 F.3d 833, 838 (10th Cir. 2012).  We review de novo the ultimate determination of reasonableness under the Fourth Amendment.  Id.

Investigative detentions are Fourth Amendment seizures of limited scope and duration.  See United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012).  In order to effect a lawful stop, police must have an objectively reasonable and articulable suspicion that criminal activity is afoot.  See United States v. Sokolow, 490 U.S. 1, 7 (1989).  In determining whether reasonable suspicion exists, we look at the totality of the circumstances.  United States v. McHugh, 639 F.3d 1250, 1256 (10th Cir. 2011).  Further, we "need not rule out the possibility of innocent conduct."  United States v. Arvizu, 534 U.S. 266, 277 (2002).  In fact, reasonable suspicion may exist even where "it is more likely than not that the individual is *not* involved in any illegality."  United States v. Johnson, 364 F.3d

1185, 1194 (10th Cir. 2004). Reasonable suspicion requires only "some minimal level of objective justification." Sokolow, 490 U.S. at 7 (internal quotation marks omitted).

On appeal, Mr. Conner argues that his seizure violated the Fourth Amendment. Aplt. Open. Br. at 11. First, he maintains that the 911 call did not possess the requisite indicia of reliability. Aplt. R. Br. at 3–9. Second, he argues that the call—even if considered reliable—failed to establish a reasonable suspicion of criminal activity. Id. at 10–14. We address each argument in turn.

A.     Was the 911 Call Reliable?

To determine whether a 911 call possessed sufficient indicia of reliability, we consider the totality of the circumstances. "[R]elevant factors include: (1) whether the informant lacked 'true anonymity' . . . ; (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police . . . corroborate[d] information provided by the informant." United States v. Chavez, 660 F.3d 1215, 1222 (10th Cir. 2011).

Mr. Conner argues that an unidentified caller's tip is not trustworthy, relying upon Florida v. J.L., 529 U.S. 266 (2000). In J.L., an anonymous caller reported that a black male was standing at a bus stop and carrying a gun. See id. at 268. The informant failed to provide any information about himself or the

basis of his knowledge. See id. at 271. The Court held that the call was unreliable and, therefore, did not justify a Terry stop. See id. at 271–72. But the Supreme Court explained that "there are situations in which an anonymous tip, suitably corroborated, exhibits sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." Id. at 270 (internal quotation marks omitted). Further, we have repeatedly distinguished J.L.'s anonymous tipster from persons who divulge "sufficient details . . . to render [themselves] readily identifiable by police." United States v. Brown, 496 F.3d 1070, 1076 (10th Cir. 2007). In other words, "[t]he fact that the officers did not know the caller's name is not dispositive on the question of anonymity." Id. at 1075.

Here, the caller did not disclose his name but provided enough information to render himself readily identifiable—he gave the operator his phone number and address. See, e.g., Chavez, 660 F.3d at 1222–23 (finding the caller "readily identifiable" where he did not provide his name but indicated he was a Wal-Mart employee at a specific store); United States v. Copening, 506 F.3d 1241, 1247 (10th Cir. 2007) (holding that an anonymous tip supported a Terry stop where the informant provided several details but refused to give his name); Johnson, 364 F.3d at 1191 (tip was sufficiently reliable where caller did not give his name or address but provided his phone number). Therefore, this was not a situation where an anonymous tipster could lead police astray by accusing a suspect

without fear of accountability; rather, police could have found the caller had his tip proved false.  See Brown, 496 F.3d at 1075 (distinguishing a situation where police have information about a tipster from J.L., where all police had was the bare report of an unknown, unaccountable caller).

Second, the caller in this case stated that he personally heard someone yell, "No, no," and saw a man place a gun into his waistband.  Further, he indicated that these events had just occurred.  Consequently, the caller's immediate, firsthand knowledge added to the reliability of his statements.  See Illinois v. Gates, 462 U.S. 213, 234 (1983) (concluding that informant's tip was entitled to "greater weight" where informant claimed to have observed the event "first-hand"); Chavez, 660 F.3d at 1222; Copening, 506 F.3d at 1247; Brown, 496 F.3d at 1076; United States v. Hauk, 412 F.3d 1179, 1191 (10th Cir. 2005) ("[A] claim of first-hand knowledge[] and information about the circumstances of learning the information[] lends weight to the credibility of the tip.").

Third, the caller provided specific details about what he had heard and seen.  He reported hearing someone yelling, "No, no."  He described seeing a light-skinned black male, wearing a fuzzy hunting hat, who exited from a black SUV and placed a gun in his waistband.  Further, the caller provided the specific location of the SUV.  The number and precision of these details added to the tip's reliability.  See, e.g., Gates, 462 U.S. at 234 (ascribing added weight to a tip where it contained an "explicit and detailed description"); Chavez, 660 F.3d at

1222 (finding that the tipster's "detailed information about the events he witnessed" strengthened the tip's reliability); Copening, 506 F.3d at 1247; Hauk, 412 F.3d at 1191; United States v. Tucker, 305 F.3d 1193, 1201 (10th Cir. 2002).

Fourth, although the caller did not explicitly state his motivation for reporting the information, the fact that he provided his name and address to the 911 operator suggests that he was acting as a concerned citizen rather than a "malicious tipster," as Mr. Conner posits. Aplt. Open. Br. at 29; see Chavez, 660 F.3d at 1222 (finding an innocuous motivation where the unidentified caller reported a disturbance in his employer's parking lot). The caller's desire to remain anonymous "provide[s] no indication that [he] had iniquitous intentions." Copening, 506 F.3d at 1247. Rather, the caller's reluctance to disclose his name "suggests [he] refused to do so not because he was lying, but because he was afraid of the armed man he was implicating." Brown, 496 F.3d at 1078. "Residents of neighborhoods are [often] in the best position to monitor activity on the streets. But residents, also fearful of the consequences, may not always wish to identify themselves and volunteer their names." United States v. Perkins, 363 F.3d 317, 326 (4th Cir. 2004).

Finally, the officers corroborated several details of the 911 call. They discovered the black SUV in the precise location provided by the caller. See Chavez, 660 F.3d at 1222 (finding an unidentified caller's tip reliable where the responding officer verified the tipster's report of a black pickup truck and white

Cadillac in a specific parking lot). Further, they spotted a light-skinned black male in a fuzzy hunting hat, just as the caller had described. See Copening, 506 F.3d at 1247 (emphasizing the fact that an officer corroborated the informant's report before initiating a stop); Brown, 496 F.3d at 1077–78 (same); Johnson, 364 F.3d at 1191 (holding tip to be sufficiently reliable where the officer confirmed an informant's description of the suspect's appearance and location, though the officer did not personally witness any criminal behavior). In fact, Mr. Conner's counsel acknowledged at oral argument that the officers had enough information from the tip to identify Mr. Conner and, accordingly, made a proper identification based on that information.

In sum, the 911 call possessed the requisite indicia of reliability.

B.    Did Police Have a Reasonable, Articulable Suspicion that Criminal Activity Was Afoot?

The Fourth Amendment permits police to effect a brief stop in order to investigate the possibility of criminal involvement if they have a "reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Police must have a particularized and objective basis for suspecting wrongdoing. Arvizu, 534 U.S. at 273. But "[t]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur." Adams v. Williams, 407 U.S. 143, 145 (1972). Instead, "Terry recognizes that it may be the essence of good police work to adopt an

- 11 -

intermediate response." Id.

Reasonable suspicion may exist even where a 911 call fails to allege criminal activity and the responding officers do not observe any illegal conduct. See Copening, 506 F.3d at 1243–47; see also Wardlow, 528 U.S. at 125–26; Terry, 392 U.S. at 22–23. The Supreme Court "has often spoken of the wrongdoing itself in general terms." United States v. Pack, 612 F.3d 341, 356 (5th Cir. 2010). At times, actions "consistent with innocent behavior . . . may give rise to a reasonable suspicion of criminal activity." Oliver v. Woods, 209 F.3d 1179, 1188 (10th Cir. 2000). Ultimately, we must evaluate the totality of the circumstances to determine whether reasonable suspicion existed. Sokolow, 490 U.S. at 7–8.

The fact that a stop occurred in a high-crime area is a relevant consideration in the Terry analysis. See Wardlow, 528 U.S. at 124; McHugh, 639 F.3d at 1257; United States v. DeJear, 552 F.3d 1196, 1201 (10th Cir. 2009). Here, the officers testified to the area's reputation as one of the most dangerous in Denver, as well as their personal knowledge of and experience with the location's high crime rate.

Another factor in determining the existence of reasonable suspicion is the time of night. See, e.g., Michigan v. Long, 463 U.S. 1032, 1050 (1983); McHugh, 639 F.3d at 1257 ("[T]he fact that an incident occurred late at night or early in the morning is relevant to the Terry analysis."); Gallegos v. City of

Colorado Springs, 114 F.3d 1024, 1029 (10th Cir. 1997). The district court determined that the stop occurred at 11:00 p.m., and we agree that the late hour lends weight to the reasonableness of the officers' suspicion.

Although the district court did not rely on it, viewing the facts in the light most favorable to the government allows us to consider Officer Snow's perception that Mr. Conner walked into a parking lot upon seeing police when there appeared to be no reason to do so. Though Mr. Conner did not run, Officer Snow's perception of evasive behavior is a minor factor that also supports a finding of reasonable suspicion.

Further, there was a "temporal and geographic association" between someone yelling "No, no," and the observation of a man putting a handgun in his waistband. One obvious inference from the call was that a gun may have been pointed at someone (or someone felt threatened), and Mr. Conner was responsible. Though the officers did not observe a confrontation when they arrived at the scene, they had reason to investigate. In Copening, we upheld a Terry stop where an unidentified caller reported seeing a man drop a pistol outside a convenience store and then stash the pistol in his car. See 506 F.3d at 1243. Despite the fact that neither the caller nor the police observed explicit illegal conduct, the totality of the circumstances gave rise to a reasonable suspicion of criminal activity. See id. at 1246–47. Indeed, Mr. Conner admits that officers plainly had a sufficient basis to identify him and would have been derelict had they not investigated him, given the report that he was armed with a

- 13 -

concealed handgun. Aplt. Open. Br. at 34. His position is that the officers should have begun with a voluntary, consensual encounter, but Fourth Amendment reasonableness is broad enough to defer to law enforcement in this case.[1]

Therefore, we conclude that "[t]his is clearly not a case of police officers arbitrarily stopping an individual walking down the sidewalk during the middle of the afternoon." McHugh, 639 F.3d at 1259 (internal quotation marks omitted). Nor is this a case of police officers arbitrarily stopping an individual walking down an alley late at night in a high-crime area. Here, the officers had a sufficiently reliable tip and a reasonable suspicion of criminal activity—they believed Mr. Conner might have been involved in an armed confrontation. "Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further." United States v. Cortez-Galaviz, 495 F.3d 1203, 1208 (10th Cir. 2007).

AFFIRMED.

---

[1] We conclude that the facts in this case are more analogous to those in United States v. Valentine, 232 F.3d 350 (3d Cir. 2000) (upholding a Terry stop), than they are to the facts presented in United States v. Ubiles, 224 F.3d 213 (3d Cir. 2000) (finding insufficient grounds for reasonable suspicion).