**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

BRANDON LAMAR WILLIAMS,

    Defendant - Appellant.

No. 15-1210
(D.C. No. 1:14-CR-00055-CMA-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HOLMES**, **SEYMOUR**, and **PHILLIPS**, Circuit Judges.
_____

Brandon Williams was arrested following a *Terry*[1] stop. The district court denied his motion to suppress evidence from the stop, including a gun and statements Williams made after his arrest. Williams ultimately pleaded guilty to possessing a firearm while being a felon, after reserving his right to appeal the suppression issue. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] *See Terry v. Ohio*, 392 U.S. 1, 21–24 (1968).

## I.    Facts

At 1:34 a.m. on January 30, 2014, Denver police received a 911 call reporting that a man at the Metro Bar had pulled a gun on another patron. The police knew the caller's identity because the caller identified himself and the name given matched the name revealed by police software identifying owners of cell phone numbers. The caller described the man with the gun as a light-skinned black male, about 5'9" and 140 lbs. The caller described the man as wearing a red baseball hat with a star on it and a black jacket or sweatshirt with a hood. The caller also stated that the man may have had a ponytail. The caller noted that there were four people at a table including the man with the red hat. The caller accurately described the layout of the Metro Bar, including the stairs leading to the bar, and told the police that the man was in a booth to the left. The police knew that Bloods gang members frequented the Metro Bar, although gang activity at the bar had declined. Red is the color associated with Bloods members.

Officer Robert Hart arrived at the bar within six minutes of the call and awaited backup, which arrived soon after. The officers walked up the stairs into the bar with Officer Hart leading, followed by Officer Ramone Young, Officer Raymond Hild, and Officer Jason Vincent. All officers were in uniform. The four officers soon saw Williams, who matched the caller's description and was the only person in the bar wearing a hat—indeed, a red one with a star. Williams was standing with three other men by a booth to the left where the caller had said they were. Everyone in the bar except Williams looked at the officers when they entered. Officer Hart walked

2

past Williams, moving behind Williams with the other three officers in front of Williams.

The caller had reported that Williams put the gun in his back pocket. Officer Hart could not see the outline of a gun in Williams's back pocket. Because of the danger raised by a man's displaying of a gun in a crowded bar, Officer Hart—while walking past Williams—quickly grabbed Williams's back pockets to see if he could feel a gun. He felt what he believed was Williams's wallet but nothing resembling a gun. Officer Hart did not speak to Williams or tell him that he was a police officer during that initial action. Officer Hart then began "a more traditional pat down search" to look for a weapon, a "systematic" pat down from top to bottom. R. vol. 3 at 32. Williams reached for his pants pockets. Officer Hart thought Williams was trying to pull his pants up, but he then mistakenly thought he heard Officer Young say "gun." Officer Young saw Williams reaching into his right jacket pocket and grabbed Williams's arm and yanked it from the pocket. Williams extended his arm in a throwing motion. Although Officer Young did not see a gun, Officer Hild and Officer Vincent saw a silver handgun fly from Williams's hand and land on a pool table. Neither officer saw Williams take the gun from his pocket. Officer Vincent grabbed the gun while Officer Hild helped Officer Hart and Officer Young subdue a resisting Williams. The entire encounter lasted a matter of seconds.

A federal grand jury sitting in the District of Colorado indicted Williams on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). He moved to suppress from evidence the gun seized in the bar and

3

Williams's statements to the officers that he claims were fruits of the officers' illegal discovery. The district court denied the motion in a minute order after a hearing. Williams then pleaded guilty under a written plea agreement but reserved his right to appeal the suppression issue. He received a 42-month sentence. Williams now appeals, challenging the district court's denial of his motion to suppress.

## II.    Discussion

In reviewing a district court's denial of a motion to suppress, we view the evidence in the light most favorable to the prevailing party and accept the district court's factual findings unless they are clearly erroneous. *United States v. Ruiz*, 664 F.3d 833, 838 (10th Cir. 2012). We review de novo a district court's ultimate determination of reasonableness. *Id.*

Police officers don't run afoul of the Fourth Amendment by briefly detaining a person whom they reasonably suspect is involved in criminal activity even when they lack probable cause to arrest. *Terry v. Ohio*, 392 U.S. 1, 21–24 (1968). An officer may then perform a reasonable search for weapons where the officer has reason to believe that the detained person may be armed and dangerous. *Id.* at 27; *see Adams v. Williams*, 407 U.S. 143, 144–46, 149 (1972) (holding that an officer performed a legal *Terry* stop when he acted on an anonymous tip that a man in a car had narcotics and a gun by approaching the car and grabbing the gun that had not been visible from outside the car from the man's waistband where the informant had stated the gun would be). *Terry* stops must meet a two-pronged test: the stop must be "(1) 'justified at its inception,' and (2) 'reasonably related in scope to the circumstances which

4

justified the interference in the first place.'" *United States v. Salas-Garcia*, 698 F.3d 1242, 1248 (10th Cir. 2012) (quoting *Terry*, 392 U.S. at 20). If a stop does not meet those requirements, it is an arrest and must be supported by probable cause. *Id.* Williams challenges both prongs.

Williams argues that the 911 call was not sufficiently reliable to justify a *Terry* stop. In determining whether a 911 call possessed sufficient indicia of reliability, we consider the totality of the circumstances. *United States v. Conner*, 699 F.3d 1225, 1229 (10th Cir. 2012). We consider five non-exclusive factors: "(1) whether the informant lacked true anonymity; (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police corroborated information provided by the informant." *Id.* (alterations and quotation marks omitted) (quoting *United States v. Chavez*, 660 F.3d 1215, 1222 (10th Cir. 2011)). No single factor is dispositive of reliability. *Chavez*, 660 F.3d at 1222. Although anonymous 911 calls have been found insufficiently reliable, *see, e.g.*, *Florida v. J.L.*, 529 U.S. 266, 271 (2000), anonymous tips, "suitably corroborated," can exhibit sufficient indicia of reliability to justify a *Terry* stop, *id.* at 270. Providing firsthand knowledge adds to the reliability of the statements. *Illinois v. Gates*, 462 U.S. 213, 234 (1983). Specific details about the events that led to the call also support reliability. *Id.* at 234. When officers verify specifics provided by the caller, it adds to the reliability of the tip. *Chavez*, 660 F.3d at 1222.

5

Here, the caller was not anonymous—he provided police with his name, and the cell phone he called from had a telephone number that matched the name given by the caller. Williams does not see that information as sufficient, because the caller did not provide additional information that would allow police to verify the caller's identity. The law, however, requires only that the caller "divulge[] enough distinguishing characteristics to limit his possible identity to only a handful of people" so that "he is capable of being identified and thus is not anonymous." *United States v. Brown*, 496 F.3d 1070, 1075 (10th Cir. 2007). A name and phone number are sufficient.

The caller reported contemporaneous, firsthand knowledge and provided detailed information about what happened, accurately describing Williams and his clothing and what area of the bar he was in. Police were able to corroborate the information both by their preexisting knowledge of the layout of the bar and by verifying the caller's description of Williams, his clothing, and his location in the bar when they arrived within six minutes of the telephone call.

Finally, Williams's assertions about the caller's motivations are mere speculation. We have held that a 911 caller's leaving his name and address "suggests that he was acting as a concerned citizen rather than a malicious tipster." *Conner*, 699 F.3d at 1230 (quotation marks omitted). A name and phone number are no different. We are unpersuaded by Williams's argument that police should not have trusted the tip, because only one call came from the bar even though multiple people were in the bar. Given that the bar was known to be frequented by Bloods members and that

6

Williams's red hat with a star was consistent with Bloods' membership, it might be less surprising that the police did not receive a second tip. Based on these factors, the stop was justified at its inception.

Williams next challenges whether the officers had reasonable suspicion of criminal activity. "Reasonable suspicion may exist even where a 911 call fails to allege criminal activity and the responding officers do not observe any illegal conduct." *Id.* at 1231. "Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further." *Id.* at 1232 (quoting *United States v. Cortez-Galaviz*, 495 F.3d 1203, 1208 (10th Cir. 2007)). In determining whether reasonable suspicion existed, we consider the totality of the circumstances. *Id.* at 1231. That this stop occurred in a high-crime area is relevant to the analysis. *See id.* The additional layer of the subject of the stop being at a bar frequented by gang members and wearing gang colors bolsters that relevance. The late hour is also a relevant consideration. *Id.* Here, there was a sufficiently reliable tip that, in concert with the time and location of the events, gave rise to a reasonable suspicion of criminal activity, namely, that Williams had pulled a gun on another person in the bar.

We now move to the second *Terry* requirement—the scope of the stop. At the threshold there is a factual dispute: Williams claims that Officer Hart reached into Williams's back pocket, but Officer Hart asserts that he merely grabbed and frisked Williams's pockets without ever reaching into them. The district court gave credence

7

to Officer Hart's testimony over Williams's. *See* R. vol. 3 at 152 ("Corporal Hart[] . . . abruptly grab[bed] Mr, Williams' back pants' pocket . . . ."). Because we view the facts in the light most favorable to the prevailing party and because we defer to the district court's findings of fact unless they are clearly erroneous, we accept Officer Hart's version of events.

In light of that, Williams's argument fails at its premise. Williams asserts that "[w]hat had started as an exploratory pat-down quickly turned into a search at the time [Officer] Hart reached into Mr. Williams['s] back pocket." Appellant's Opening Br. at 15. As we have stated, we accept Officer Hart's version of the event: that he never reached into Williams's pocket. Therefore, even under Williams's argument, the *Terry* stop never proceeded beyond the acceptable bounds.

Finally, Williams's argument that the officers' precautionary measures were excessive fails.[2] Although Williams's challenge is to the behavior of all of the officers involved, he takes particular umbrage with the actions of Officer Hart. In particular, Williams argues that Officer "Hart's decision to pretend like he was walking past Mr. Williams and then suddenly and abruptly grabbing his back pant pockets was not reasonable given the conditions which existed in the bar." *Id.* at 17. Williams further asserts that "[t]his is especially true in light of the fact that there

---

[2] While Williams asserts that the officers used a Taser on him twice, he offers no evidence of the timing or circumstances surrounding those incidents. The evidence in the record indicates that the officers used the Taser because Williams was resisting and would not allow the officers to gain control of Williams's arms. Additionally, any issues regarding the use of a Taser were not argued below. Therefore, Williams has waived the argument. *United States v. Burke*, 633 F.3d 984, 987–88 (10th Cir. 2011).

was no evidence present which indicated that Mr. Williams had committed a criminal act." *Id.*

Police officers are "authorized to take such steps as [a]re reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985). "In determining whether the precautionary measures were reasonable, the standard is objective—'would the facts available to the officer at the moment of the seizure warrant a man of reasonable caution in the belief that the action taken was appropriate.'" *Gallegos v. City of Colo. Springs*, 114 F.3d 1024, 1030–31 (10th Cir. 1997) (quotation marks and alteration omitted) (quoting *United States v. McRae*, 81 F.3d 1528, 1536 (10th Cir. 1996)).

The officers' actions here were reasonable. As we discussed above, the officers had a reasonable suspicion of criminal activity. More specifically, they had a reasonable suspicion that a person matching Williams's description had pulled a gun on another person in a crowded bar.[3] Given the situation at hand, Officer Hart acted

---

[3] It is disputed whether Williams was acting suspiciously—Williams asserts that he never saw the officers while Officers Hart and Hild both stated that everyone but Williams turned to look at the officers when they entered, suggesting Williams was aware of their presence. The dispute is irrelevant to our analysis, however, because the focus of the inquiry is on whether a reasonable person in the officers' position would have believed the force used was appropriate and, therefore, the facts as they appeared at the time to that officer are relevant. *Gallegos*, 114 F.3d at 1030–31; *see Graham v. Connor*, 490 U.S. 386, 398 (1989) (noting that the Fourth Amendment inquiry is one of "'objective reasonableness' under the circumstances"). Even if Williams just did not notice the officers, from their perspective it was reasonable to believe that he was actively trying not to look at them and, therefore, acting suspiciously.

reasonably in not speaking to Williams before frisking him. The risk of Williams pulling out the gun and shooting an officer or a bystander was unacceptably high. *See United States v. Rochin*, 662 F.3d 1272, 1273 (10th Cir. 2011) (noting that the aim of a *Terry* frisk is "to ensure the physical safety of the officer and others"). By not speaking to Williams first, Officer Hart had an opportunity to locate the gun before that could happen.

### III.    Conclusion

We affirm the district court's order denying Williams's motion to suppress evidence.


Entered for the Court


Gregory A. Phillips
Circuit Judge