**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 25, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

 Plaintiff - Appellee,

v.

DESMOND S. GAINES,

 Defendant - Appellant.

No. 19-3177
(D.C. No. 2:15-CR-20078-JAR)
(D. Kan.)

### ORDER AND JUDGMENT[*]

Before **HARTZ**, **KELLY**, and **HOLMES**, Circuit Judges.

In September 2017, a jury convicted Desmond S. Gaines of five federal offenses involving illegal drugs and a firearm. Before his trial began, Mr. Gaines moved to suppress certain evidence as the fruit of an unlawful seizure. The district court denied the motion. It concluded that Mr. Gaines's initial encounter with police—which led to the discovery of the illegal drugs and firearm—was consensual and not a seizure. The encounter itself was precipitated by an anonymous 911 tip.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

In a prior appeal, we reversed. We held that Mr. Gaines's initial encounter with police was a Fourth Amendment seizure and not consensual. As a result, we vacated Mr. Gaines's conviction and remanded so the district court could determine whether the seizure was justified by reasonable suspicion. On remand, the district court concluded the police officers had a reasonable suspicion to seize Mr. Gaines. It again denied his motion to suppress evidence and reinstated the original judgment.

The issue now before us is whether the district court erred in concluding that reasonable suspicion existed to seize Mr. Gaines. We hold that the court did not err. Therefore, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I

One morning in August 2015, an anonymous tipster called 911 to report that a man was selling phencyclidine, or PCP, near the Wilhelmina Gill Center and the Frank Williams Center in downtown Kansas City, Kansas. The Wilhelmina Gill Center houses a food kitchen; the Frank Williams Center offers resources to the homeless. The 911 call lasted nearly two-and-a-half minutes. At the beginning of the call, the tipster indicated that he was in downtown Kansas City near the two centers.[1] Then he said, "we have a suspect in all red clothing selling juice," i.e., PCP. Gov't Ex. 1 at 0:10–0:14 (911 Call).

_____

[1] The district court refers to the tipster using the pronouns for the male gender (e.g., "he"), even though it does not appear to have explicitly found that the tipster was male. We follow suit. Insofar as the court's use of male-gender pronouns amounts to a tacit finding that the tipster was male—based on our review of the audio recording of the tipster's 911 call—this finding would not be clearly erroneous.

2

The 911 operator asked about the alleged suspect's race and the tipster replied, "light skinned black." *Id.* at 0:21–0:23. The tipster continued: "I don't know what kind of car he's driving today, but he's down here at the Gill Center, and he has on all red, red hat, red shirt, big red shorts." *Id.* at 0:25–0:34. According to the tipster, the man in red "just made about 20 dollars." *Id.* at 0:46–0:49.

The 911 operator asked for the exact address where the tipster and man in red were located. "I don't even know," the tipster replied. *Id.* at 0:53–0:54. But then he said, "let me go inside and ask." *Id.* at 0:59–1:01. It is not clear where the tipster went, but he subsequently confirmed that his location was "645 Nebraska." *Id.* at 1:10–1:17. The 911 operator then asked where the officers should go when they arrived. The tipster said, "to the parking lot." *Id.* at 1:22–1:23. The operator asked what kind of car the man in red was driving. The tipster again said "I don't know," but volunteered to try to find out. *Id.* at 1:34–1:39. The tipster then stated, "I'm watching him right now," *id.* at 1:40–1:41, and said that the man in red was "still not going to his car yet," *id.* at 2:02–2:05, but was instead "just standing on the corner," *id.* at 2:07–2:10. Near the end of the call the tipster commented, "after this guy we have only one more supplier, and that's it." *Id.* at 1:55–2:00.

Shortly before 10:00 a.m., two Kansas City police officers—one male and one female—responded to the call. While approaching the Wilhelmina Gill Center, the male officer saw a man in the parking lot who matched the description provided by the tipster.

3

The man was Mr. Gaines. As Mr. Gaines entered a white Cadillac, the officers received a call over their police radio from an off-duty police officer who had been working at the Frank Williams Center that morning. The off-duty officer had kept his police radio on and heard the officers dispatched in response to the 911 call. Earlier that morning, he had noticed a man dressed in all red in the Frank Williams Center parking lot. The off-duty officer radioed to the responding officers, "that's him in that white Cadillac." R., Vol. I, at 137 (Test. of Mark Wilcox, dated Mar. 8, 2017).

The officers parked close to the Cadillac that Mr. Gaines occupied and turned on their emergency lights. Both officers exited their vehicles. Mr. Gaines did the same and shut his door. Mr. Gaines asked the male officer what he was doing. The officer replied that he had received a call that a person matching Mr. Gaines's description was selling drugs in the parking lot. Mr. Gaines said it was not him. The male officer then asked Mr. Gaines for identification. Mr. Gaines said it was in his car trunk and reopened the Cadillac's driver's side door to open the trunk. With the door and trunk open, the male officer smelled a strong chemical odor coming from the vehicle. The officer believed it was PCP. He also noticed an open alcohol container in the front console—an arrestable offense.

The male officer informed Mr. Gaines that he would have to handcuff and detain him for the open container. As the officer tried to handcuff Mr. Gaines, he quickly pulled away, grabbed a black bag from the driver's side floorboard, shoved the officer, and ran

4

away. The responding officers chased Mr. Gaines on foot and eventually apprehended him. They also recovered the black bag. It contained PCP, cocaine, and marijuana. Later, police discovered a black handgun and more cocaine in Mr. Gaines's Cadillac .

A federal grand jury indicted Mr. Gaines on five counts involving illegal drugs and a firearm.[1] Mr. Gaines moved to suppress the drugs and firearm evidence, arguing it was the fruit of an unlawful seizure. The district court denied the motion. It held Mr. Gaines's initial encounter with police officers—from the time the officers first approached his car to when one officer saw the open alcohol container—was consensual. The case proceeded to trial and a jury convicted Mr. Gaines on all five counts. The district court sentenced Mr. Gaines to 180 months' imprisonment and eight years of supervised release.

Mr. Gaines appealed. We reversed and held that the initial encounter between Mr. Gaines and the police—before the officer spotted the open alcohol container—was a Fourth Amendment seizure. We noted that the seizure "would have been permissible if the police had a reasonable ground to suspect Mr. Gaines of a crime," but the district

---

[1] The five counts listed in the indictment were (1) possession with intent to distribute twenty-eight grams or more of crack cocaine, in violation of 28 U.S.C. § 841(a)(1) and (b)(1)(B)(iii); (2) possession with intent to distribute marijuana, in violation of 28 U.S.C. § 841(a)(1) and (b)(1)(D); (3) possession with intent to distribute PCP, in violation of 28 U.S.C. § 841(a)(1) and (b)(1)(C); (4) possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c); and (5) possession of a firearm as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). R., Vol. I, at 26–28 (Indictment, filed Sept. 2, 2015).

court did not address "the reasonableness of the police's suspicion." *United States v. Gaines*, 918 F.3d 793, 802 (10th Cir. 2019). We declined to opine on this matter in the first instance. Instead, we reversed the district court's order denying Mr. Gaines's suppression motion and remanded so the district court could consider whether the officers had a reasonable suspicion to justify the seizure. *Id.* at 803.

On remand, the district court found reasonable suspicion existed to seize Mr. Gaines. The court's conclusion rested in part on factors similar to those highlighted in *Navarette v. California*, 572 U.S. 393, 399–400 (2014), where the Supreme Court upheld an investigatory stop based on an anonymous tip. Specifically, the district court noted that "the caller told the operator where he was, [ ] stayed on the phone for over two minutes, and [ ] answered every question that was put to him, including answering the operator honestly that he did not know what type of car [the] [d]efendant was driving." R., Vol. I, at 238 (Mem. and Order, dated Aug. 9, 2019). Additionally, the court credited the responding officers' first-hand knowledge of drug-related activity around the Wilhelmina Gill Center, and the off-duty officer's observations. Taken together, the court held these facts provided responding officers with reasonable suspicion to conduct an investigatory stop. The court, therefore, denied Mr. Gaines's motion to suppress and reinstated its original judgment. This appeal followed.

**II**

The Fourth Amendment protects against "unreasonable searches and seizures."

6

U.S. CONST. amend. IV. However, this mandate does not prevent police officers from making a brief investigatory stop of a person when they have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also United States v. McHugh*, 639 F.3d 1250, 1255 (10th Cir. 2011) (noting that an investigatory stop is justified "if the specific and articulable facts and rational inferences drawn from those facts give rise to a reasonable suspicion a person has or is committing a crime" (quoting *United States v. DeJear*, 552 F.3d 1196, 1200 (10th Cir. 2009))). The "reasonable suspicion" needed to justify a stop depends "upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990). We look to "the totality of the circumstances—the whole picture" to determine whether police have a reasonable suspicion. *Cortez*, 449 U.S. at 417; *see also United States v. Sanchez*, 519 F.3d 1208, 1213 (10th Cir. 2008) (explaining that we assess the "reasonableness of the officer's suspicions . . . by an objective standard taking the totality of the circumstances and information available to the officers into account" (quoting *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004))).

A mere hunch is not enough; nevertheless, a reasonable suspicion requires "considerably less than proof of wrongdoing by a preponderance of the evidence," and "obviously less" than the proof needed for probable cause. *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also United States v. Chavez*, 660 F.3d 1215, 1221 (10th Cir. 2011)

7

("Although 'reasonable suspicion requires [an] officer to act on something more than an inchoate and unparticularized suspicion or hunch, the level of suspicion required . . . is considerably less than proof by a preponderance of the evidence or that required for probable cause.'" (quoting *McHugh*, 639 F.3d at 1255–56)).

"These principles apply with full force to investigative stops based on information from anonymous tips." *Navarette*, 572 U.S. at 397. The Supreme Court has struck a delicate balance on when an anonymous tip can provide a reasonable suspicion for an investigatory stop. The Court has noted that "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity," and therefore seldom supplies reasonable suspicion. *White*, 496 U.S. at 329. Yet, the Court nonetheless has acknowledged that "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigatory stop.'" *Navarette*, 572 U.S. at 397 (quoting *White*, 496 U.S. at 327); *see also United States v. Madrid*, 713 F.3d 1251, 1258 (10th Cir. 2013) ("A confidential tip may justify an investigatory stop if under the totality of the circumstances the tip furnishes both sufficient indicia of reliability and sufficient information to provide reasonable suspicion that criminal conduct is, has, or is about to occur." (quoting *United States v. Leos-Quijada*, 107 F.3d 786, 792 (10th Cir.1997))).

The Supreme Court has identified several key indicia of reliability when it comes to anonymous tips. In *Alabama v. White*, a tipster told police that a woman would drive

8

from a specific apartment building to a specific motel in a specific kind of car, while transporting cocaine. The police corroborated the benign details—the apartment, the motel, and the car type—before making a stop. The Supreme Court held that the corroboration of these details made the tip sufficiently reliable to justify a stop. The Court emphasized, however, that the corroborated details related "not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted." *White*, 496 U.S. at 332 (quoting *Illinois v. Gates*, 462 U.S. 213, 245 (1983)). If a tipster can accurately predict an individual's future behavior, it implies that the tipster has "a special familiarity with [the individual's] affairs" and, in particular, "access to reliable information about that individual's illegal activity." *Id.*

But if a tip "provide[s] no predictive information and therefore le[aves] the police without means to test the informant's knowledge or credibility," it will often not justify an investigatory stop. *Florida v. J.L.*, 529 U.S. 266, 271 (2000). This was true of the tip in *Florida v. J.L.* In that case, the tipster merely said that a young Black man who was wearing a plaid shirt and standing at a particular bus stop was carrying a gun. All the police had was "the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." *Id.* In holding that the police lacked reasonable suspicion to stop and frisk the defendant—who was wearing a plaid shirt—the Court noted that an

9

"accurate description of a subject's readily observable location and appearance" is reliable only in a "limited sense": it will "help the police correctly identify the person whom the tipster means to accuse." *Id.* at 272. However, such a tip "does not show that the tipster has knowledge of concealed criminal activity." *Id.* To help establish reasonable suspicion, a tip must be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.*

But, corroborated predictive information—of the kind present in *White*, but not in *J.L.*—is not necessarily required for an anonymous tip to support a reasonable-suspicion finding. In the case that the district court here relied on, *Navarette*, a tipster called 911 to report that a truck had just run her off the road. The tipster supplied no predictive information. Yet, she provided the truck's make, model, color, and license plate number. In holding that the tip had sufficient indicia of reliability, and thus supplied a reasonable suspicion for an investigatory stop, the Court focused on three factors. First, the caller "necessarily claimed eyewitness knowledge of the alleged dangerous driving," precisely because the caller was run off of the road by the dangerous driver. *Navarette*, 572 U.S. at 399. Second, "the caller reported the incident soon after she was run off the road." *Id.* As to this point, the Court explained that this sort of "contemporaneous report has long been treated as especially reliable." *Id.* This is so because, under the law of evidence, "statements about an event and made soon after perceiving that event are especially trustworthy because 'substantial contemporaneity of event and statement negate the

10

likelihood of deliberate or conscious misrepresentation.'" *Id.* at 400 (quoting FED. R. EVID. 803(1) advisory committee's note). Third, the caller used the 911 system. Because a 911 call "has some features that allow for identifying and tracing callers" it provides "some safeguards against making false reports with immunity." *Id.*

Furthermore, without reference to predictive information, we, too, have identified certain factors that often suggest the reliability of an anonymous tip. In *United States v. Chavez*, we succinctly summarized the most important factors we usually consider:

> Although no single factor is dispositive, relevant factors include: (1) whether the informant lacked "true anonymity" (i.e., whether the police knew some details about the informant or had means to discover them); (2) whether the informant reported contemporaneous, firsthand knowledge; (3) whether the informant provided detailed information about the events observed; (4) the informant's stated motivation for reporting the information; and (5) whether the police were able to corroborate information provided by the informant.

*Chavez*, 660 F.3d at 1222. Though we place a premium on information related "to future actions of third parties [which are] ordinarily not easily predicted," such details are not necessarily required to render an anonymous tip reliable. *United States v. Hauk*, 412 F.3d 1179, 1189 (10th Cir. 2005) (quoting *Gates*, 462 U.S. at 245).

A tipster is not truly anonymous if he "provides sufficient details regarding his identity to render him readily identifiable by police," such as where he works or lives. *United States v. Brown*, 496 F.3d 1070, 1076 (10th Cir. 2007). Contemporaneous, firsthand knowledge also differs from that which is acquired "through the report of a third party or reported sometime later than the described events." *Madrid*, 713 F.3d at

11

1260–61; *see also Brown*, 496 F.3d at 1076 ("We consider it another important indicium of reliability that the caller claimed firsthand knowledge of the alleged conduct."). We likewise credit "detailed information about the events [a tipster] witnessed." *Chavez*, 660 F.3d at 1222. Additionally, motivations bolster reliability when they "bespeak an ordinary citizen acting in good faith," particularly to protect others. *United States v. Copening*, 506 F.3d 1241, 1247 (10th Cir. 2007). Lastly, police corroboration of any information provided by a tipster is also potentially relevant. *See Brown*, 496 F.3d at 1078–79 (deeming even "limited police corroboration of facts provided by the caller" relevant to the determination that "the 911 caller [ ] bore sufficient indicia of reliability to generate a reasonable suspicion").

### III

We "review de novo the ultimate question of reasonableness under the Fourth Amendment." *United States v. McNeal*, 862 F.3d 1057, 1061 (10th Cir. 2017). In doing so here, we conclude the officers had a reasonable suspicion to seize Mr. Gaines for an investigatory stop. We first consider the relevant indicia of reliability displayed by the anonymous tipster's 911 call. Then, after acknowledging the absence of predictive information in the tip, we explain why it supported the district court's finding of a reasonable suspicion. We then distinguish the tip in this case from the one in *Florida v. J.L.* Finally, we address why the drug-related activity near the area of Mr. Gaines's arrest is relevant to our reasonable-suspicion inquiry.

12

**A**

We begin with the three indicia of reliability highlighted in *Navarette*: that is, (1) "claimed eyewitness knowledge of" the illegal activity, (2) a contemporaneous report—"soon after"—the occurrence of the activity, and (3) the "use [of] the 911 emergency system." *Navarette*, 572 U.S. at 399–400.

As to the first factor, the district court found that the anonymous tipster "implie[d] that he personally observed [Mr. Gaines's] drug sale." R., Vol. I, at 236. This finding is not clearly erroneous. When the 911 call began, the tipster identified his location and then stated, "we have a suspect in all red clothing selling juice." Gov't Ex. 1 at 0:10–0:14. And, significantly supportive of the district court's finding, the tipster also reported that the man in red "*just* made about 20 dollars," *id.* at 0:46–0:49 (emphasis added), implying that the tipster possessed eyewitness knowledge of an illegal drug sale.[2]

---

[2] We recognize that, in some of our other cases, the tipster seemingly communicated in more explicit terms eyewitness knowledge of unlawful activity. *See, e.g.*, *Brown*, 496 F.3d at 1076 ("The caller in this case specifically told the 911 operator that he was present when an armed man entered [a woman's] apartment and that he saw the man's gun."); *Copening*, 506 F.3d at 1247 (noting that "the caller told dispatch he saw the . . . weapons incident"). But we conclude that the district court's finding that the tipster "implie[d] that he personally observed [Mr. Gaines's] drug sale," R., Vol. I, at 236, means the first *Navarette* factor "weigh[s] in favor of the caller's veracity," *Navarette*, 572 U.S. at 400—even if it does not do so strongly. *Cf. Brown*, 496 F.3d at 1078–79 (noting that even though there was "limited police corroboration of facts provided by the caller" it was relevant to the determination that "the 911 caller here bore sufficient indicia of reliability to generate a reasonable suspicion"). Furthermore, we underscore that the reasonable-suspicion determination is grounded on the totality of the circumstances and no one factor—including those highlighted in *Navarette*—is determinative.

13

Furthermore, the other two *Navarette* factors are both clearly satisfied here. The tipster undoubtedly made a "contemporaneous report" of Mr. Gaines's activities, both non-criminal and criminal alike. Indeed, most of the tipster's statements appeared to provide a real-time report of Mr. Gaines's activities: "I'm watching him right now," the tipster said. *Id.* at 1:40–1:41. "Yeah, he's still walking up the hill." *Id.* at 1:49–1:50. "He's just standing on the corner." *Id.* at 2:07–2:10. And, as noted, the tipster reported that "[h]e just made about 20 dollars," implying that it was from a drug sale. *Id.* at 0:46–0:49. We have ample reason, then, to conclude that the "substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *Navarette*, 572 U.S. at 400 (quoting FED. R. EVID. 803(1) advisory committee's note); *see also United States v. Conner*, 699 F.3d 1225, 1229 (10th Cir 2012) ("[T]he caller's immediate, firsthand knowledge added to the reliability of his statements."). We thus conclude that the second *Navarette* factor here "weigh[s] in favor of the caller's veracity." *Navarette*, 572 U.S. at 400

Finally, the tipster called 911 to report his observations. Again, this factor is important because a 911 call "has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity." *Navarette*, 572 U.S. at 400. The Supreme Court noted two such safeguards in *Navarette*: a recorded call "provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution," and callers cannot "block call recipients from obtaining

14

their identifying information." *Id.* at 400–01. We do not suggest that "tips in 911 calls are per se reliable." *Navarette*, 572 U.S. at 401. But the tipster's use of the 911 system is "one of the relevant circumstances that, taken together, justified the officer[s'] reliance on the information." *Navarette*, 572 U.S. at 401.

On the whole, then, the three indicia of reliability highlighted in *Navarette* favor concluding that the anonymous tip provided reasonable suspicion justifying the stop. Looking beyond *Navarette*, other factors here also demonstrate the tipster's reliability.

First, as we have framed the matter, the tipster was not truly anonymous. As previously mentioned, he used the 911 system. But that is not all. He confirmed the precise address of his physical location. *See Madrid*, 713 F.3d at 1260 (observing that "giving the address [of where the crime took place and of the caller's own location] was at least an 'indicium of reliability'" (quoting *Robinson v. Howes*, 663 F.3d 819, 829 (6th Cir. 2011))); *cf. United States v. Williams*, 403 F.3d 1188, 1194 n.5 (10th Cir. 2005) (noting that an anonymous restaurant patron who reported seeing another patron with a firearm was not truly anonymous because the tip placed the tipster at the particular restaurant at a particular time). Furthermore, the tipster here spoke for over two minutes in a known location, making it likelier that police could unearth witnesses who might help identify him. Taken together, the police quite possibly (if not likely) had "sufficient details" to "render [the tipster] readily identifiable." *Brown*, 496 F.3d at 1076.

Moreover, throughout the call, the tipster answered every question asked by the

15

operator. For example, he took time to retrieve the exact address of his location when asked. The tipster also did not obviously withhold any information. Indeed, he appeared to answer honestly that he did not know what type of car Mr. Gaines was driving. And, importantly, the tipster never declined to give his name. Instead, the 911 operator did not ask for it. This, too, is an indicium of reliability. *See Madrid*, 713 F.3d at 1260 (deeming it significant that "the 911 operator never asked the caller for his name or other identifying information and there [was] no reason to believe he would not have provided this information if requested"); *United States v. Torres*, 534 F.3d 207, 212 (3d Cir. 2008) (noting that although the tipster never gave his name, "he was not asked to do so").

We also have often inquired into a tipster's motivations, and here "the 911 transcripts provide no indication that the caller had iniquitous intentions." *Copening*, 506 F.3d at 1247. In particular, it strikes us as improbable that an individual intending to falsely attribute criminal conduct to another would speak to a 911 operator in the kind of measured and circumspect manner displayed by the tipster here—who, for example, freely admitted when he did not know the answer to the 911 operator's questions. The length of the call is also relevant: the tipster did not rush to lodge a hasty false allegation and dash off unidentified. *See Johnson*, 364 F.3d at 1191 (crediting the length of an anonymous tipster's call as an indicium of reliability). If anything, the 911 call suggests that the tipster possibly acted with an commendable motive—seeking to rid the area around the Wilhelmina Gill Center of drug-related activity. Specifically, near the end of

16

the call the tipster said, "And after this guy, we only have one more supplier, and that's it." Gov't Ex. 1 at 1:55–2:00. This comment would appear to "bespeak an ordinary citizen acting in good faith." *Copening*, 506 F.3d at 1247. At the very least, nothing in the call suggests that the tipster had a malicious motive.

Moreover, throughout the call, the tipster provided detailed information about Mr. Gaines's appearance, location, and movements. We have said that when a tipster "provide[s] detailed information about the events he [is] observing," it is "another indicium of reliability." *Madrid*, 713 F.3d at 1261; *see also Conner*, 699 F.3d at 1230 ("The number and precision of [a tipster's] details added to the tip's reliability."). We value detailed tips because "[o]verly generic tips, even if made in good faith, could give police excessive discretion to stop and search large numbers of citizens." *Johnson*, 364 F.3d at 1191. The anonymous tip in this case "did not provide the officers with excessive discretion to stop and search a large number of citizens." *Sanchez*, 519 F.3d at 1214. Instead, the tipster identified the suspect's physical appearance and location with a fairly high degree of specificity. In that way, because "the description's considerable detail significantly circumscribed the number of people police could have stopped in reliance on it," we deem the tip's details another indicium of reliability. *Johnson*, 364 F.3d at 1191.

**B**

We acknowledge the tipster did not provide the kind of predictive information that often renders an anonymous tip reliable. In particular, we cannot say that the information

17

provided here described "future actions of third parties ordinarily not easily predicted." *White*, 496 U.S. at 332 (quoting *Gates*, 462 U.S. at 245). Relatedly, at first blush, the tip here might seem similar to the tip in *Florida v. J.L.*—the one the Supreme Court held did not supply reasonable suspicion for a stop. In this case and in *J.L.*, the tipster communicated to law enforcement that a person of a certain description, wearing certain clothing, was at a particular location doing something illegal. However, we nevertheless conclude that the tip here significantly supports a reasonable-suspicion finding and that *J.L.* is distinguishable.

First, the Supreme Court has never indicated that an anonymous tipster *must* provide corroborated predictive information to support a finding of reasonable suspicion. *See Parker v. Chard*, 777 F.3d 977, 980 (8th Cir. 2015) (noting that in *J.L.* and *White* the Supreme Court "did not hold that corroboration of predictive elements is the exclusive measure of a tip's reliability"). After all, this inquiry must take into account the totality of the circumstances, and not solely whether a tipster supplies predictive information that police corroborate.

Second, since *Florida v. J.L.*, we have repeatedly suggested that police corroboration of even non-predictive information provided by a tipster—especially in conjunction with other relevant factors—can be indicative of reliability. *See, e.g.*, *Hauk*, 412 F.3d at 1189 ("Corroboration of information other than predictive facts, such as the basis of the informant's knowledge, the circumstances under which it was obtained, and

18

the amount of detail about the alleged criminal activity, can also justify reliance on an anonymous tip in appropriate circumstances."); *Conner*, 699 F.3d at 1230 (finding an anonymous tipster reliable when police "discovered the black SUV in the precise location provided by the caller" and "spotted a light-skinned black male in a fuzzy hunting hat, just as the caller had described"); *Chavez*, 660 F.3d at 1222 (crediting as an indicium of reliability the fact that officers verified "that there was a black pickup truck and a white Cadillac in the parking lot" specifically identified by the tipster); *Johnson*, 364 F.3d at 1191 (emphasizing that the tipster's "descriptions of [the defendants'] appearance and location" were confirmed by an officer's observations). This does not mean that, *standing alone*, law enforcement corroboration of such non-predictive information can "be used to confirm the reliability of an anonymous informant for the purpose of establishing . . . reasonable suspicion." *United States v. Tuter*, 240 F.3d 1292, 1297 (10th Cir. 2001). But, in light of the totality of the circumstances, it is still significant that the police corroborated non-predictive information provided by the tipster—namely, that a light-skinned Black man in all red clothing was located at a particular parking lot.[3]

---

[3] On this point, we also find it worth mentioning—though it is admittedly a factor of modest weight—that the off-duty officer radioed to the responding officers when they arrived on the scene, "that's him in that white Cadillac." R., Vol. I, at 137. The off-duty officer had seen a man fitting Mr. Gaines's description at the Frank Williams Center parking lot that morning. Of course, the off-duty officer corroborated neither predictive information nor criminal activity. But his statement nonetheless helped corroborate the identity of "the person whom the tipster mean[t] to accuse." *J.L.*, 529 U.S. at 272.

19

Furthermore, we conclude that the tip at issue in *Florida v. J.L.*—upon close inspection—is significantly different from the one here. Our prior discussion highlights why. The tipster in this case used the 911 system and was not truly anonymous. *Cf. J.L.*, 529 U.S. at 268 (recounting as to *J.L.*'s tip, that "[s]o far as the record reveals, there is no audio recording of the tip, and nothing is known about the informant"). Moreover, the tipster here contemporaneously reported his first-hand observations. *Cf. id.* (noting, as to *J.L.*'s tip, that "[s]ometime after the police received the tip—the record does *not say how long*—two officers were instructed to respond" (emphasis added)). Furthermore, the tipster in this case made the tip from a known location. *Cf. id.* at 270 (noting that the tip in *J.L.* came from "an unknown location"). Also, adding to his credibility, the tipster in this case withheld no information, appeared to have a benign motive, and answered all the questions put to him (if he could) over a somewhat lengthy call. These factors were not available to support the tipster's credibility in *J.L.*; indeed, "nothing [was] known about the [tipster]." *Id.* at 269. Accordingly, *J.L.* is distinguishable and does not lead us to alter our conclusion regarding the reliability of the tip here.

Our reasonable-suspicion inquiry is a holistic one—which takes account of the totality of the circumstances. No single consideration is determinative. Viewed through this all-encompassing lens, the relevant factors in the anonymous-tipster inquiry here weigh in favor of a determination that the 911 call was sufficiently reliable to support an investigatory stop. This is so despite the absence of predictive information.

20

## C

Importantly, the district court's reasonable-suspicion determination did not solely rest on evidence of the anonymous tip. In addition to the tipster's call, evidence of drug-related activity in the area of the Wilhelmina Gill Center was a legitimate contributing factor in creating a reasonable suspicion for the investigatory stop.

Mr. Gaines's mere "presence in a high-crime area is not, 'standing alone,' enough to provide reasonable suspicion." *United States v. Dennison*, 410 F.3d 1203, 1208 (10th Cir. 2005) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). However, "the fact that conduct occurs in an area known for criminal activity [is an] appropriate factor[] to consider in determining whether reasonable suspicion exists." *DeJear*, 552 F.3d at 1201; *see also United States v. Pena-Montes*, 589 F.3d 1048, 1055 (10th Cir. 2009) (noting that whether a stop occurs "in a high-crime area is a relevant consideration" for a reasonable-suspicion analysis); *Dennison*, 410 F.3d at 1208 (acknowledging that a defendant's "presence in a high crime area . . . may be a 'relevant contextual consideration'" (quoting *Wardlow*, 528 U.S. at 124)). After all, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Wardlow*, 528 U.S. at 124.

In reaching its reasonable-suspicion determination, the district court partially relied on significant evidence of drug-related activity near the Wilhelmina Gill Center. Both

arresting officers testified about this activity. The female officer testified she knew about "a lot of medical-type calls [for] individuals on PCP, along with complaints of narcotics sales in the area." R., Vol. I, at 126 (Trial Test. of Shenee Davis, dated Mar. 8, 2017). The other (male) officer testified that he has responded to "a lot of narcotics complaints" around the Wilhelmina Gill Center. *Id.* at 86 (Trial Test. of Carl Rowland, dated Mar. 8, 2017). He told the court that in the period leading up to the arrest of Mr. Gaines, "[w]e had [ ] increased contact with individuals under the influence of PCP." *Id.* He also recalled that police sometimes received "multiple [calls] within a few minutes in that general area [concerning] individuals exhibiting behavior that [suggested] they were under the influence of PCP." *Id.* at 86–87. Furthermore, other evidence presented at trial confirmed that, in the two months prior to Mr. Gaines's arrest, police had been called to the area three times for drug overdoses.

In short, the area around the Wilhelmina Gill Center attracted drug-related activity. Consequently, a reasonable officer in the shoes of the arresting officers here would have almost certainly taken this fact into consideration in determining whether Mr. Gaines's conduct was sufficiently suspicious to justify an investigatory stop. And we conclude that the district court properly determined that this evidence of drug-related activity provided support for the reasonableness of the officers' stop.

Of course, standing alone, this evidence of drug-related activity would not have given the officers reasonable suspicion to conduct an investigatory stop of an individual

in the vicinity of the Wilhelmina Gill Center.  *See, e.g.*, *Dennison*, 410 F.3d at 1208.  But, this evidence did not stand alone.  In conjunction with the anonymous tipster's call, the area's reputation for drug-related activity was a "relevant contextual consideration" that helped create a reasonable suspicion to stop a particular individual—Mr. Gaines.  *Id.*

## IV

Based on "the totality of the circumstances and information available to the officers," *Johnson*, 364 F.3d at 1189 (quoting *United States v. Lang*, 81 F.3d 955, 965 (10th Cir. 1996)), we conclude there was reasonable suspicion justifying an investigatory stop of Mr. Gaines.  We therefore **AFFIRM** the judgment of the district court.

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

23